WILLIAM H. MEESE ET AL., RECEIVERS, *v.* GLADYS GOODMAN

JOHN R. RULLMAN, JR., *v.* GLADYS GOODMAN

[Nos. 46, 47, October Term, 1934.]

*Decided January 15th, 1934.*

The causes were argued before BOND, C. J., URNER, OFFUTT, PARKE, and SLOAN, JJ.

*Wallis Giffen,* with whom was *Philip S. Ball* on the brief, for the receivers, appellants.

*Walter L. Clark,* with whom was *Roszel C. Thomsen* and *Clater W. Smith* on the brief, for John R. Rullman, Jr., appellant.

*Robert E. Kanode* and *Milton Leven,* for the appellee.

SLOAN, J., delivered the opinion of the Court.

On May 7th, 1933, about 1:30 o'clock A. M., the plaintiff, Gladys Goodman, while the guest of Charles E. Newcomer, in the latter's automobile, which he was driving, was seriously and permanently injured when the automobile collided, first on the right, with an automobile driven by the defendant, John R. Rullman, Jr., and then, to the left with a trolley pole of the United Railways & Electric Company planted in the center of the North Ave-

nue Bridge in Baltimore City, just eastward of the intersection of McMechen Street and North Avenue.

The suit was brought against the Mayor and City Council of Baltimore, the receivers of the United Railways & Electric Company, John R. Rullman, Sr., John R. Rullman, Jr., and Hazel E. Newcomer, administratrix of Charles E. Newcomer, deceased. The plaintiff *non prossed* as to John R. Rullman, Sr., and the Mayor and City Council of Baltimore, and obtained a judgment against the other defendants, of whom the receivers of the United Railways & Electric Company and John R. Rullman, Jr., separately appealed. Mrs. Newcomer did not appeal.

The plaintiff was employed at her father's restaurant at Roland Park as a waitress. Her working hours were from 3:30 o'clock in the afternoon to 1 o'clock in the morning. On the night of the accident, after closing the restaurant, the plaintiff, her brother, Kenneth Goodman, her cousin, James H. Meyers, Adeline Jenkins, and Elmer Ness got into Newcomer's Essex automobile with him. They let Ness out at Chestnut and Thirty-sixth Streets, and the five others drove to the Goodman home on Chestnut Street, stopping just long enough for the plaintiff to go into the house and out again. Someone suggested taking a drive, so the party started for the home of a girl friend of the plaintiff, who lived two blocks away. The friend declined to go along. The party of five then proceeded through Druid Hill Park, coming to North Avenue at Park Avenue, where they turned eastward (left), and thence to the North Avenue Bridge, where the collision occurred, resulting in the death of Newcomer and Kenneth Goodman, and the injury of the plaintiff.

The plaintiff's proof of negligence, so far as it affects the defendant Rullman, is substantially contained in her testimony as follows:

"We had an accident or collision on North Avenue Bridge. When we reached McMechen Street I saw a big red truck in front of us, and in back of the truck was a machine, a closed car, closed automobile. We were behind

that car. I saw that when we came to McMechen Street. * * * The first time I saw the truck was when I got to McMechen Street. I looked ahead and saw the big truck and this car in back of it, and Mr. Newcomer wanted, I think, to pass the other car, I don't know, and we started gradually to pass this car and we had gotten up to about the middle of the car that was in front of us—I don't know whose it was—and suddenly, without any warning at all, the car in front of us made a quick left turn and we hit it * * * about middle ways. The right hind side of the car I was riding in, the right front wheel and fender hit that car. The next thing I knew I heard a little crash (with the trolley pole on her left) and that's all I know."

"When I first saw the truck in front of the car I was riding in and the automobile that was behind it, the truck was the closest over to the curb. The other automobile was almost directly in back of the truck only a little over to the left. * * * I don't know how fast the car I was riding in was going, but we couldn't have been going very fast. (Meyers said they were going about twenty-five miles an hour and picked up to thirty or thirty-five miles to pass Rullman.) * * * I think we were going faster than the car I saw behind the truck as we came up on the bridge. I did not hear any warning or signal given by the driver of the car I was in before this collision, did not hear any." Asked "what signal you observed or warning before that car turned to the left?" Plaintiff answered, "None. We were riding in the eastbound car track."

There is evidence in the record that Newcomer was intoxicated, but the plaintiff and the other two surviving occupants of the car testified otherwise, so that the question of the plaintiff's contributory negligence in intrusting her safety to a drunken driver becomes a question for the jury.

The testimony of the plaintiff, in which her companions concur, entitled Rullman to have the case against him withdrawn from the jury, as it plainly shows that he violated no duty which he owed to the plaintiff. The uncon-

tradicted evidence is that it was Newcomer's negligence and failure to observe the rules of the road that resulted in the plaintiff's injuries. *Hagerstown v. Foltz,* 133 Md. 52, 104 A. 267; *Wash., B. & A. R. Co. v. State, use of Hall,* 136 Md. 103, 111 A. 164; *Wilson v. Yates,* 137 Md. 54, 111 A. 161. Assuming that Newcomer was sober, or that the plaintiff did not know or appreciate the fact that he was intoxicated, her only right to compensation was against him. The complaint is that Rullman suddenly turned to the left without warning into the path of the Newcomer car, a movement that could not have been so sudden for a car going at a moderate rate of speed. The plaintiff infers that, because the headlights of the Newcomer car were lighted, Rullman should have been aware of their intentions and actions. The statute says the one wishing to pass should signal the one to be overtaken. Rullman says that he never turned out of his course, that he was going straight ahead, which no witness gave as over twenty-five miles an hour, and that he was not aware of the presence of the Newcomer car until it grazed his car, nor of the truck until immediately after the Newcomer car collided with his car and the trolley pole. If there was a truck ahead followed by a pleasure car, any prudent driver would have expected the latter to pass the truck and would have governed himself accordingly.

It was not Rullman's duty at that time and place, and under the conditions there existing, to give notice or warning to a car in his rear of his intention to pass a car or truck ahead of him. The rules of the road applicable to the situation in this case are prescribed by the Act of 1929, ch. 224 (Code, Supp. art. 56, sec. 209: "All vehicles * * * when being driven upon the highways of this State shall at all times keep to the right of the center of the highway upon all highways of sufficient width, except upon streets or roads where traffic is permitted to move in one direction only, and except when overtaking and passing another vehicle, and unless it is impracticable to travel on such side of the highway; * * * and any vehicle overtaking another going in the same direction shall

pass to the left of the vehicle so overtaken [*Elliott on Roads and Streets* (3rd Ed.) sec. 1084], provided the way ahead is clear of approaching traffic and the operator signals the vehicle intended to be passed by the use of his horn or other signalling device." And: "Any vehicle so overtaken shall promptly, upon signal, turn as far as reasonably possible to the right in order to allow free passage on the left." There is no need to cite authorities or decisions as to the proper behavior of Rullman and Newcomer under the circumstances here in evidence. The statute as quoted says what they should have done, and is the authority to be followed. The plaintiff's whole argument against Rullman implies that the accident happened because of his violation of the statutory rule of the road, though the mere violation of a statute or ordinance is not evidence of negligence, unless the violation of the statute or ordinance was the proximate cause of the accident. *Kelly v. Huber Buking Co.,* 145 Md. 321, 325, 125 A. 782. But in this case there is no evidence of reckless or unlawful driving by Rullman, or of his failure, upon demand, to yield the right of way. On the contrary, the one who violated the law and failed to observe the rules of the road was Newcomer, and, if he had done what the law required of him, the accident might not have happened and the plaintiff be uninjured. Rullman's prayer for a directed verdict should therefore have been granted.

The complaint against the United Railways & Electric Company (second amended declaration) is that it maintained a trolley pole, one of a line of seven, in the center of North Avenue Bridge, and that it was an "unreasonable and dangerous obstruction to traffic," and that it was "without any device for signalling or warning the public of the presence and danger of said pole," and that "the said Charles E. Newcomer * * * in attempting to prevent and avoid a collision with the automobile which was then and there carelessly and recklessly driven and operated by the defendant, John R. Rullman, Jr., so carelessly and recklessly operated the automobile in which the plaintiff was a passenger as to cause it to collide with

the automobile operated by the defendant, John R. Rullman, Jr., and the trolley pole situated in the center of the bed of North Avenue, at or about a point two hundred feet easterly of the intersection of North Avenue and McMechen Street."

The declaration is built around the opinion in the case of *Stern v. International Railway Co.*, 220 N. Y. 284, 115 N. E. 759, 761, much of the language of which has been used in its composition. The physical facts in the *Stern* case bear a striking likeness to those of the instant case, but the premises from which the conclusion was drawn do not so accurately fit this case. In that case the location of the center trolley poles was found to rest in the judgment of the railway company, thus making the wisdom of their location a question of fact, and that, being so placed by the railroad company, it was a question of fact as to whether the City of Buffalo was guilty of permitting the maintenance of a public nuisance. The impression we get from the opinion in that case is that, if the poles had been so placed at the direction of the municipal authorities, the decision would have been the reverse of what it was. This is not the only court that so construes that opinion. See *Kaplan v. Herman*, 232 App. Div. 513, 250 N. Y. S. 532, in which guests sued the driver of an automobile and the Interborough Transit Company, the former for the negligent driving and the latter for maintaining unlighted pillars which supported an elevated railroad on a street in New York. The railroad, with the pillars supporting it, was located and installed on a public street in New York by authority of law, and the pillars horizontally striped as in this case. See, also, *Wegmann v. City of New York*, 195 App. Div. 540, 186 N. Y. S. 893.

The *Stern* case, *supra*, in the principles involved, has more in common with the case of *Phelps v. Howard County*, 117 Md. 175, 82 A. 1058; *Earp v. Phelps*, 120 Md. 282, 87 A. 806. The injuries in the *Phelps* case were alleged to have been due to the negligent location of telegraph poles so near the traveled way of a county road as

to be dangerous to the ordinary users of the road, and the county commissioners were charged with negligently so permitting their location. The telegraph company had erected its lines with the permission of the County Commissioners of Howard County, and under the authority of the Act of 1868, ch. 471, sec. 129 (Code, art. 23, sec. 295), by which it was provided that a telegraph company "may construct a line or lines of telegraph through this State, or from or to any point or points within this State, or upon the boundaries thereof, and along and upon any postal roads and postal routes, roads, streets and highways, or across any of the bridges or waters within the limits of this State, by the erection of the necessary fixtures, including posts, piers or abutments for sustaining the cords or wires of such lines, without their being deemed a public nuisance, or subject to be abated by any private party, provided, the same shall not be so constructed as to incommode injuriously the public use of said postal roads or postal routes, roads, highways and bridges," etc. It will be observed that the poles and lines were not given a fixed statutory location, but that the location by the telegraph company was to be done according to its judgment, but "not to be so constructed as to incommode injuriously the public use" of the roads of the state, and because of the provision for such exercise of judgment with such a restriction that the question of negligence in the location of the pole in evidence in that case was decided to be one of fact. The county commissioners, inasmuch as they had control of the roads of Howard County, were held responsible for permitting the the maintenance of the pole in what the jury held to be in dangerous proximity to the traveled way. Compare this with the opinion in the *Stern* case, *supra,* where it was said: "The statute has not said, however, where the poles shall be located. The implied condition is therefore attached that they must be so located as to avoid unreasonable and unnecessary danger to travelers upon the highways. * * * Subject to that condition, the railway company, in the absence of express command by the

municipal authorities, may place them where it will. In this part of Main Street the city gave no command. The railway company was therefore free to make its own choice if the choice was not unreasonable. Freedom of selection it had, but not freedom without limits." It therefore appears from the authorities relied on, and so freely quoted by the plaintiff in her brief, that the question of liability is largely determined by the right of choice or selection in the railway company.

The poles in this case were placed where they now are on the North Avenue Bridge, which is the full width of North Avenue, 100 feet, of which $45\frac{1}{2}$ feet are taken for sidewalks and $54\frac{1}{2}$ feet for the driveway. There are two parallel car tracks which take up 17 feet $2\frac{1}{2}$ inches, including a space 6 feet $5\frac{1}{2}$ inches between the tracks. The width of the driveway on which Newcomer was driving, from the south rail of the east-bound track, to the south curb, is 18 feet 7 inches, and between the north rail of the west-bound track and the north curb is 17 feet 8 inches.

By ordinance approved April 8th, 1891, the North Avenue Railroad Company, one of the constituents and predecessors in title of the United Railways & Electric Company, was authorized to construct the street railway in evidence, and by that ordinance it was provided: "That it shall be the duty of said North Avenue Railroad Company in making the extension hereby authorized to use iron poles of neat and ornamental design, and whenever the width of the street permits it and as in other respects possible, said poles shall be placed between its two tracks with arms on either side carrying the wires over each track and provided further, that the Mayor and City Commissioner shall determine at what points upon the line of said company said poles shall be placed between the two tracks of said company." It will therefore appear that there was municipal authority for the laying of tracks and placing of center poles, and that the mayor and commissioners were to decide where center poles should be placed, and that, when they made the decision, there was no right of choice in the railroad company. It

is not disputed that the Mayor and City Council had authority to grant franchises for the construction, maintenance, and operation of electric railways in and upon the streets of Baltimore, and on such condition as the city should prescribe.

There are seven poles about 110 feet apart on the North Avenue Bridge, the pole here involved being the westernmost, and it is, according to the plat in evidence, about 300 feet from the junction of the northeast end of McMechen Street with North Avenue, and 240 feet from the point where the McMechen Street car tracks join the North Avenue tracks. McMechen Street, a 65-foot street, runs in a northeasterly direction to the south side of North Avenue. Opposite the McMechen Street intersection, North Avenue is intersected on the north side by Lord Street, twenty feet in width, which runs into it in a southeasterly direction. At the junction of the three streets, there are three traffic signals, and the whole neighborhood, which includes the place of the accident, is well lighted. One pole eastward of the one collided with, and about seventy-five feet from the junction with McMechen Street, had been removed about a year before the accident, so that, at the time of the accident, the street was clear of obstructions for about 300 feet from McMechen Street. The poles were about twenty feet high, painted with alternate horizontal black and white stripes to a height of seven feet. There was an abundance of space for three lines of traffic on each side, on a well-lighted, adequately signalled street, a situation which made for the safety of those who drove carefully and within the law, rather than a trap for the unwary.

There was some point made by the plaintiff that there was no record in evidence of the order of the Mayor and Commissioner of the location of the poles, but on the presumption, in the absence of proof to the contrary, that officers of municipal corporations have performed their official duties, we are going to assume that these poles were placed in obedience to the ordinance of 1891. *Jones on Evidence (Civil Cases)* sec. 46.

This case, so far as it concerns the collision with the pole, is predicated on the maintenance of a nuisance by the railway company, done at the instigation and by the order of the Mayor and City Council, which had authority over the streets of Baltimore, and, if one is negligent, then both are negligent, and have been for forty years. As the court so aptly said in *Hamilton Street Railway v. Weir*, 51 Canada Sup. Ct. Reports, 506, 513, we "do not think it competent for a jury to sit in review upon such legislative work twenty years later and to find that such legislative action was an act of negligence." And this court, in *Garrett v. Lake Roland R. R. Co.*, 79 Md. 277, 286, 29 A. 830, 833, quoting from 2 *Wood, Railway Law*, 970, said: "It may be stated, as a general rule, that whatever is authorized by statute, within the scope of legislative powers, is lawful, and therefore cannot be a nuisance." And, as said in *Poole v. Falls Road Railway Co.*, 88 Md. 533, 541, 41 A. 1069, 1072: "It is sufficient to say that this court has more than once held that the construction of the railroad, being authorized by competent authority, cannot be treated as a public nuisance."

It was argued by the plaintiff that the phenomenal increase in travel and traffic since the advent of the automobile had converted what was not an unsafe street forty years ago, when the electric railway with center poles was installed, into a traffic hazard and a nuisance, a theory borrowed from the opinion in *Stern v. International Railway Co.* 220 N. Y. 284, 115 N. E. 759. When the franchise for North Avenue was granted, the tracks laid, the poles planted, and the trolley lines strung, there were no automobiles, the vehicles using the streets being horse-drawn, but the only difference which the Legislature has recognized has been to apply the rules of the road, by the Act of 1929, ch. 224 (Code, Supp. art. 56, sec. 209), to all kinds of vehicles, whether "motor, horse-drawn or otherwise" alike, and has prescribed in that act a set of rules or course of conduct which if respected would, notwithstanding the increase and changes in traffic, and were designed to, avoid the accidents which too frequently

occur. If Newcomer had respected the requirements of this act, this accident would not have happened, as his was not only the proximate cause, but the only negligent act producing the injuries complained of, which means that the prayers of both appellants for a directed verdict should have been granted.

There were fifty-eight exceptions taken by one or more of the defendants, of which eleven were to remarks of the court, one of them taking two pages of the record, forty-six on objections to evidence, and one, the last, to the rulings on the prayers, but, as this decision goes to the legal sufficiency of the evidence and the right of recovery against the defendants, it is unnecessary, and would perhaps be gratuitous, for us to discuss the other questions arising in the course of the trial.

There were demurrers to the declaration and all of its amendments, and, as the case was heard on its merits and so presented here, we can assume, without deciding, that the declaration was sufficient, though, as we decide, the facts were not.

*Judgment against the appellants in Nos. 46 and 47 reversed, without a new trial, with costs in both appeals.*