731 A.2d 931

**Irene COATES et al.**

v.

**SOUTHERN MARYLAND ELECTRIC COOPERATIVE, INC. et al.**

**No. 100, Sept. Term, 1998.**

Court of Appeals of Maryland.

June 16, 1999.

**500**

C. Christopher Brown (Brown, Goldstein & Levy, LLP, Baltimore; James F. Farmer, Andrew D. Alpert, Farmer, Welch & Alpert, Waldorf, all on brief), for Appellants.

Phillip R. Zuber (Sasscer, Clagett & Bucher, Upper Marlboro, on brief), for Appellees.

Paul D. Bekman, Michael P. Smith, Israelson, Salsbury, Clements & Bekman, Baltimore, for Amicus Curiae, the Maryland Trial Lawyers' Ass'n.

Argued before BELL, C.J., and ELDRIDGE, RODOWSKY, CHASANOW, RAKER, WILNER and CATHELL, JJ.

WILNER, Judge.

This appeal arises out of a tragic one-car accident that occurred just after midnight on August 19, 1991. The vehicle, driven by George Thompson, went out of control, left the road, and struck a utility pole, killing one passenger, Mary Ann Coates, and injuring another, Mary Ann's minor daughter, Lavita Coates. Lavita Coates was pregnant at the time and lost the baby as a result of the accident.

## BACKGROUND

A number of lawsuits were filed by appellant, Irene Coates, Mary Ann's mother. The one that concerns us is against Southern Maryland Electric Cooperative, Inc. (SMECO), the owner of the pole that was struck. Ms. Coates, suing for herself individually and in a representative capacity for Mary Ann, Lavita, Lavita's sister, and Lavita's unborn child, claimed that SMECO was negligent in placing the pole, as constructed, only three feet, three inches from the traveled portion of the roadway. The Circuit Court for Charles County, finding that SMECO owed the plaintiffs no duty of care, granted the utility's motion for summary judgment. We accepted appellate jurisdiction prior to argument in the Court of Special Appeals and shall affirm the judgment of the circuit court.[1]

---

1. In a separate action, Ms. Coates also sued Thompson, alleging negligence on his part. Although that action was consolidated for trial with the instant one, this case was resolved on summary judgment and thus never tried. Summary judgment as to liability was entered against

Thompson was driving his employer's pickup truck north on Olivers Shop Road in Bryantown. He, Mary Ann, and Lavita were seated abreast in the front seat, Mary Ann in the middle and Lavita next to the passenger's door. Olivers Shop Road is a rural county highway, described as "hilly and twisty," with one lane in each direction. In the area where the accident occurred, it has no shoulder. The width of the roadway at that point was stated to be 21 feet, three inches. The northbound lane was 10 feet, two inches, and the southbound lane was 11 feet, one inch. The road had a double yellow center line, white edge lines, and a posted speed limit of 35 miles per hour. The roadside consists of grass and vegetation.

Thompson, who had lived in the area for a long time, traveled the road frequently and was familiar with it. On the night of the accident, it was drizzling, and the road was wet. The rear tires on the truck were "kind of bald," and the back end of the truck slid "a little bit" when Thompson applied the brakes. After successfully negotiating a number of turns, Thompson went over a bridge and then entered a turn to the left, slowing, he said, to between 25 and 30 miles per hour. When he hit a "dip" in the road, the truck began to slide, eventually spinning out of control, counter-clockwise, across both the center line and the southbound lane and coming to rest when it hit the southern face of the pole broadside. The entire truck was then off the road. As indicated, although the issue of damages has not been resolved, and thus no judgment has been entered against Thompson, through the granting of Coates's partial motion for summary judgment as to liability, the court found, as a matter of law, that Thompson was negligent and that his negligence was a cause of the accident. That negligence was based on his failure to control the speed

---

Thompson, but we are informed that the action against him remains pending (or at least was pending when the briefs in this appeal were filed) on the issue of damages. That does not affect the finality of the judgment in this action, however; all claims against all parties in this action have been resolved. *See Yarema v. Exxon Corp.*, 305 Md. 219, 503 A.2d 239 (1986).

of the truck, both generally and when approaching and going around curves.

The pole had been installed by SMECO in 1954, pursuant to both permission from the county and a private easement. The county's assent was initially given, in 1928, to a predecessor in title and was assigned to SMECO in 1945. That assent authorized the utility to construct electric lines along, upon, or above the streets and roads in Charles County provided that "the same shall not be so constructed as to incommode the public use of the said" streets and roads. There is no indication that the county ever instructed SMECO or its predecessors precisely where to locate the pole, or any of its poles. The actual easement does not appear to be in the record. A SMECO witness testified that the utility had a right of way 15 feet from the poles for the purpose of access and maintenance.[2]

The pole that was originally erected in 1954 was a wooden one. In 1970, the State Highway Administration acquired the road, along with a 30 foot right of way. In answer to an interrogatory, SMECO averred that "[i]mprovements were made [by the State] in and around the area where the utility pole exists which may have involved some widening of the roadway," although the record does not reveal what improvements were made, whether and to what extent the road was widened, and whether and to what extent any widening would have placed the pole in greater proximity to the traveled portion of the road. In 1981, the pole was damaged in an automobile accident, the nature and details of which are presently unknown, and, as a result, it was reinforced. The existing pole was cut at ground level, the stump was removed and replaced with a concrete stub, a metal sleeve was placed over the new stub, and the pole was reset in the sleeve. No

---

2. In answer to an interrogatory asking SMECO to identify all documents relating to the utility line and pole, SMECO noted that Right-of-Way Plat No. 40498, Right-of-Way Deed dated June 25, 1970, and construction staking sheet for work order No. CH 12040 dated September, 1965, were in the possession of counsel. Those documents do not appear to be in the record.

thought was given at the time to moving the pole. Company policy was not to move a pole during a repair operation. SMECO personnel gave two reasons for that policy: one, that there was an established right of way at the existing location; and two, that changing the location of a pole involves an alteration of the forces on the pole and may require a complete reconstruction of the line. One employee noted that if a pole were moved, there would not be enough slack in the line and that some splicing and cutting, which was dangerous work, would have to be done. In 1988, the road was returned by the State to county jurisdiction. At no time since the initial installation of the pole in 1954 was SMECO asked or directed by the State or the county to move the pole.

Appellant produced deposition testimony from two experts in support of her position that SMECO was negligent in leaving the reinforced pole in the same location. Dr. Paul Wright, a retired engineering professor, was deposed twice—once in February, 1995, and again in June, 1997. On the first occasion, he expressed the opinion that the pole was "too close to the road" and stated that it was "accepted orthodoxy" among highway engineering designers that it was "not a very smart thing to do ... to put poles that close to the road especially in the vicinity of curves." He did not have a "magic number" as to how far away a pole should be but noted that a study of roadside crashes in Georgia conducted by him demonstrated that "about 85 percent of fatal crashes result from striking something 30 feet or less from the edge of the pavement." He made the obvious point that the farther away the pole, the less likely that it would be hit, but repeated that "I can't give you a number and say this is the ideal place for this pole." Based on his measurements, Dr. Wright determined that the "critical speed" in the vicinity of the accident— *i.e.*, "the maximum speed that a vehicle can traverse the curve without leaving the roadway on the outside of the curve"—was 52 to 56 miles per hour.

In his second deposition, Dr. Wright, based on highway design manuals, stated that it was desirable that there be a clear path on each side of the road of at least 10 feet, free of

fixed objects other than guardrails. He opined that a failure to comply with that standard would be a deviation from accepted engineering practice. Dr. Wright made clear, however, that his opinion did not go to what was usual and customary in electric utility practice, because he was unaware of that practice, but only whether the road itself was safe. He acknowledged that the design manuals he consulted were for use by highway officials and did not know if they were customarily used by electric utilities in the design of distribution lines.

Appellant's second expert was John St. Clair, who expressed particular concern about concrete-reinforced poles, noting that the concrete block, if struck, would do substantial damage to the vehicle and likely cause injury. St. Clair had worked for four utility companies. Although he acknowledged that there were no formal policies relating to pole placement, the informal policy, he said, was to keep them off the shoulders. He also agreed that, when poles are replaced following an accident, in most cases they are put back in the same place. With particular relevance to this case, Mr. St. Clair noted that, when a road contains a left curve, the best and safest place for a pole is on the *inside* of the curve, which is where it was with respect to Mr. Thompson. He also stated that if the pole had been moved six feet, rather than three feet, off the road, it would have met the standards of practice in 1981 with respect to vehicles traveling southbound, on the inside of the curve.

## DISCUSSION

The circuit court entered summary judgment for SMECO upon a finding that the utility owed no duty to the plaintiff—to Mary Ann, Lavita, Lavita's sister, or Lavita's unborn child. That finding, in turn, proceeded from the court's conclusion that the duty of care on the part of the utility in placing its poles was not to interfere with the "proper use and reasonable use of the highway by vehicles," and that, as a result, it did not extend to situations in which the driver of the vehicle was negligent. The court concluded that it would be an impossible burden to expect a utility to anticipate and prepare for inci-

dents arising from a driver's unreasonable and negligent conduct.

Appellant takes issue with that determination. This Court, she argues, has looked to a number of factors in determining the existence of a duty, including the foreseeability of harm, the nexus between the defendant's conduct and the injury suffered, the policy of preventing future harm, the extent of the burden to the defendant and the consequences to the community of imposing a duty, and the availability, cost, and prevalence of insurance for the risk involved, and, in her view, those factors support the finding of a duty on the part of utilities, even to negligent drivers. It *is* foreseeable, she claims, that vehicles will leave the road because of driver error and that people will suffer injury as a direct result of the placement of poles too close to the road. Public policy demands that utilities be encouraged to consider traveler safety when locating their poles and not be granted immunity simply because a driver was careless, and evidence produced by her in this record demonstrates that, through the availability of insurance and the possible need to relocate poles that are dangerous even to non-negligent drivers, the cost of imposing the extended duty is manageable. Finally, she avers, even if a utility has no duty to a negligent driver, it has one to innocent passengers, to whom the negligence of the driver may not be imputed.

SMECO does not dispute the general principles asserted by appellant but does, of course, disagree with her analysis of them. It accepts her claim that "[i]t is foreseeable that drivers can, for any number of reasons, leave the paved highway" and that "[t]raffic accidents happen in countless ways." It also agrees that declaring the existence of a duty "is the coalescence of all of the public policy considerations that lead the law to impose an obligation of due care on the defendant for the protection of the plaintiff," including the foreseeability of injury, the likelihood of injury, the effect on the defendant and the societal consequences of placing the burden on the defendant. Although it does not, as the circuit court did, frame the issue in terms of driver negligence, it

maintains that for liability to attach, the pole must create a hazard for vehicles traveling "in the ordinary course of travel," and that a utility has no duty to anticipate or protect against a vehicle "that leaves the roadway out of control." Such a burden, it urges, would be too great.

### The Maryland Law

 In order to state a cause of action for negligence, the plaintiff must show, first, that the defendant was under a duty to protect the plaintiff from the injury. We have discoursed on the subject of duty on a number of occasions in recent years. In *Rosenblatt v. Exxon,* 335 Md. 58, 77, 642 A.2d 180, 189 (1994), we pointed out that, in determining the existence of a duty, we have applied a "foreseeability of harm" test, "which is based upon the recognition that duty must be limited to avoid liability for unreasonably remote consequences." *See also Valentine v. On Target, Inc.,* 353 Md. 544, 727 A.2d 947 (1999). Inherent also in the concept of duty is the relationship of the parties, but, if the risk created is one of personal injury, rather than merely economic damage, a direct relationship between plaintiff and defendant need not be shown. *Jacques v. First Nat'l Bank,* 307 Md. 527, 535, 515 A.2d 756, 760 (1986).

 Ultimately, however, we have recognized that "the determination of whether a duty should be imposed is made by weighing the various policy considerations and reaching a conclusion that the plaintiff's interests are, or are not, entitled to legal protection against the conduct of the defendant." *Rosenblatt v. Exxon, supra,* 335 Md. at 77, 642 A.2d at 189. We have made clear that there is no set formula for making that determination, but we have looked to the factors noted by Professors Prosser and Keeton, namely, "convenience of administration, capacity of the parties to bear the loss, a policy of preventing future injuries, [and] the moral blame attached to the wrongdoer," adding as well, from *Tarasoff v. Regents of University of California,* 17 Cal.3d 425, 131 Cal.Rptr. 14, 551 P.2d 334, 342 (1976), "the extent of the burden to the defendant and consequences to the community of imposing a duty to

exercise care with resulting liability for breach, and the availability, cost and prevalence of insurance for the risk involved." *Ashburn v. Anne Arundel County,* 306 Md. 617, 627, 510 A.2d 1078, 1083 (1986), quoting from PROSSER AND KEETON ON TORTS, § 53 (W. Keeton 5th ed.1984) and from *Tarasoff.*

We first dealt with the potential liability of a utility company arising from its placement of a pole in proximity to a public road in *Phelps v. Board of Com'rs of Howard Co.,* 117 Md. 175, 82 A. 1058 (1912) and *Earp v. Phelps,* 120 Md. 282, 87 A. 806 (1913)—two appeals in the same case. The plaintiff, a passenger on a hay wagon driven by a team of five horses, was injured when the "lazy board" upon which he was seated collided with a telegraph pole. He sued the county—the owner of the road—and the telegraph company, alleging that the pole was located too close to the roadway, such that the collision ensued even though the wagon was entirely on the roadway, and that its placement thus violated the defendants' duty to keep the public roads in a safe condition for public travel. The first appeal arose from the granting of the defendants' demurrers, the argument being that the complaint was not sufficiently definite in describing the alleged negligence. We concluded that the complaint was sufficient, that whether the road was made unsafe by the location of the pole was an issue of fact, to be determined after considering "the dimensions, conformation and established use of the roadway." *Phelps v. Howard Co.,* 117 Md. at 179, 82 A. at 1059. We said, in that regard:

> "There may be conditions under which the erection and maintenance of a telegraph pole as near as the one in question to the traveled portion of a highway would not be regarded as an unreasonable interference with the rights of the public. But it could not be held, as a matter of law, that such an object could under all circumstances be so located with impunity."

*Id.*

On remand, trial was held, resulting in a judgment for the plaintiff. It was established that the plaintiff was sitting on

the "lazy board," which extended about two-and-a-half feet beyond the hub of the left rear wheel. Immediately on the left side of the road was the pole, and immediately on the right side was a tree. The entire roadway between those objects—22½ feet—was paved, and the evidence showed that the road "was used all the way from the tree to the telegraph pole." *Earp v. Phelps, supra,* 120 Md. at 286, 87 A. at 808. In order to pass another wagon, the driver moved to the left, and, with the wheels of the wagon still entirely on the road, the plaintiff's legs collided with the pole. In that second appeal, we took as established that the plaintiff was brought into contact with the pole while the wagon was in the traveled part of the road and while he was riding in a proper and customary manner. The question, then, was whether the pole was "so placed in the highway as to injuriously incommode its use for the purposes of public travel or constitute 'a source of danger by reason of its close proximity to the travelled portion of the road.' " *Id.* at 288, 87 A. at 808, quoting in part from *Phelps v. Howard Co., supra.*

We answered in the affirmative. The pole, as located, "was an object against which a vehicle on the travelled way could readily strike in passing." *Id.* The road space available for travel "was considerably less than the usual legal width of 30 feet, and it can not be said to have been so wide as to make the danger of collision with the pole too remote and improbable to be reasonably anticipated by those who were responsible for its location." *Id.* at 288–89, 87 A. at 809.[3] Accordingly, we declined to hold as a matter of law that the pole could be erected and maintained at that location without liability "for the injury it occasioned to one using the road in a lawful and customary way." *Id.* at 289, 87 A. at 809. We noted in that regard that, although the issue was essentially one of fact and in the particular case was submitted to and decided by a jury, it cannot "be made the subject of mere conjectural or capri-

---

3. The source of the Court's comment about the "usual legal width" of a road being 30 feet is not clear from the Opinion. There was no evidence in this case regarding the usual legal or actual width of rural county roads.

cious judgment and should not be submitted to the jury in the absence of proof legitimately tending to support the theory upon which recovery is sought." *Id.* The critical fact in *Earp*, of course, was that the collision and injury occurred while the plaintiff and the vehicle were lawfully on the traveled portion of the road; the pole thus interfered with the safe travel of a vehicle while on the traveled portion of the public roadway.

*Earp* represents the farthest reach of the Maryland cases. In *Meese v. Goodman*, 167 Md. 658, 176 A. 621 (1935), a vehicle traveling on a Baltimore City street collided with a trolley company's electric pole situated in the middle of the street, between the two trolley lines, when the driver swerved to the left to avoid colliding with a car to his right. The driver was attempting, improperly, to pass the other car. The trolley company was sued on the premise that the pole constituted an unreasonable and dangerous obstruction to traffic. We reversed a judgment for the plaintiff, a passenger in the vehicle, on the grounds that (1) unlike the situation in *Earp*, the pole was placed pursuant to municipal direction and not at the discretion of the trolley company, and (2) the sole proximate cause of the collision was the driver's negligent conduct. In that latter regard, we concluded, at 670, 176 A. at 625, that "[i]f [the driver] had respected the requirements [of the law], this accident would not have happened, as his was not only the proximate cause, but the only negligent act producing the injuries complained of...."

In *Parsons v. C. & P. Telephone Co.*, 181 Md. 502, 30 A.2d 788 (1943), an automobile left a State highway and collided with a telephone pole located in a ditch at the side of the road, a few feet from the traveled portion of the road. Relying largely on *Earp*, the driver and a passenger sued the telephone company for negligently erecting the pole in a place where it caused the road to become unsafe. The complaint alleged that immediately adjacent to the side of the road, which had no shoulder, was a ditch, that vegetation in the ditch gave the appearance of level ground, and that the automobile went off the traveled portion of the road into the ditch and was guided forcibly through the ditch into the pole.

Affirming the sustaining of the utility's demurrer, we concluded from those allegations that the cause of the accident was not the location of the pole, but rather the condition of the highway. We noted that "it would have made no difference whether appellee's pole was two or three feet, or more, from the roadway because it was the ditch 'which forcibly guided said automobile into said pole.'" In contrast to *Earp*, the plaintiff's car "was not on the traveled portion of the road, but without any explanation whatever being given . . . as to why and how it happened, it is simply alleged that the car 'went off' the traveled portion, then hit the ditch by which it was forcibly guided into the pole. . . ." *Id.* at 505–07, 30 A.2d at 790. Whether the basis of our decision was lack of duty, lack of proximate cause, or both is not entirely clear.

In *E. Coast Fr. Lines v. Cons. Gas Co.*, 187 Md. 385, 50 A.2d 246 (1946), a dreadful accident occurred late at night when a tractor-trailer proceeding along a Baltimore City street jumped a curb surrounding a grass plot in the middle of the street, struck an electric pole located three feet from the beginning of the plot, crossed into the oncoming lane, and collided with another truck. The lights in the area were out due to recent storm damage, and the driver could not see painted street markings warning of the median plot. Evidence showed that a pole in that location had been struck some 17 times and had been repaired or replaced by the electric company each time. The plaintiff contended that the pole was a dangerous nuisance and that the utility was negligent in continuing to repair and replace it. Although recognizing, from *Earp*, that a utility pole may become a nuisance by reason of its location and, if located improperly so as to endanger traffic, the utility may be liable, we concluded, from other case law, that "where competent municipal or public authority has fixed the location of obstructions, such obstructions are not of themselves nuisances and the contractor who places them in the designated positions is not responsible." *Id.* at 398, 50 A.2d at 252. That, indeed, was the situation in that case. The City was later held to be liable, *E. Coast Lines*

*v. M. & C.C. of Balto.*, 190 Md. 256, 58 A.2d 290 (1948), but not the electric company.

It is evident from these cases, the most recent of which is more than 50 years old, that we have found liability on the part of a utility only when (1) the utility chose the location of the pole, free from governmental direction, and (2) the pole created a danger to persons while on the traveled portion of the road. Although we have not ruled out, as a matter of law, liability in situations when a vehicle leaves the traveled portion of the road and strikes a pole adjacent to but not obstructing traffic on the traveled portion, we have to date, for one reason or another, found no liability in each of the cases in which that situation was presented.

### *The Law Elsewhere*

Given the prevalence of utility poles along the nation's streets and highways, it is not surprising that those poles have been the object of thousands of collisions, resulting in many lawsuits against not only the governmental entity that owns or maintains the road but also the owners or erectors of the poles. The facts vary, of course, from one case to another, and so do the decisions. The courts have looked at a variety of factors in determining whether the utility should be held accountable—whether the location of the pole was mandated by some governmental authority or was determined largely or entirely by the utility, how far the pole was located from the traveled portion of the roadway, the nature and condition of the road at that point, whether the pole had been struck on earlier occasions and, if so, how often, whether the pole was to the right or the left of the vehicle in the direction the vehicle should have been traveling, the conduct of the driver, the reason why the vehicle or pedestrian left the roadway, whether it was feasible for the utility to locate the pole elsewhere, and the cost and feasibility of effectively requiring a relocation of existing poles by imposing tort liability. Some of those factors have been examined in the context of foreseeability or other considerations relating to whether there is an underlying duty on the part of the utility; others have been examined

in the context of proximate cause, whether, even if the placement of the pole was negligent, that placement effectively caused the plaintiff's injuries. The pronouncements of the courts, as might be expected, proceed from and relate to the particular factors determined to be relevant in the case.

Evidencing and synopsizing the myriad of cases arising from collisions between vehicles and poles are four A.L.R. annotations: *Liability of Company Maintaining Poles in or Near Highway for Damages to Person or Property Resulting from Road Vehicle Striking Pole,* 82 A.L.R. 395 (1933), supplemented in 98 A.L.R. 487 (1935); *Injury To Traveler From Collision With Privately Owned Pole Standing Within Boundaries Of Highway,* 3 A.L.R.2d 6 (1949); and *Placement, Maintenance, or Design of Standing Utility Pole As Affecting Private Utility's Liability For Personal Injury Resulting From Vehicle's Collision With Pole Within Or Beside Highway,* 51 A.L.R.4th 602 (1987). The general principle of law articulated in those annotations has not changed. The 1933 annotation stated, as a general proposition, that a company maintaining poles in or near a public highway is not liable for damage resulting from a road vehicle striking the pole "unless it is erected on the traveled portion of the highway or in such close proximity thereto as to constitute an obstruction dangerous to anyone properly using the highway, and the location of the pole is the proximate cause of the collision." 82 A.L.R. at 395. The 1987 annotation echoes that statement: that liability depends on whether the pole is located in or so close to the traveled portion as to constitute a danger "to anyone properly using the highway, and on whether the location of the pole is the proximate cause of the injury." 51 A.L.R. 4th at 611.

Some courts have taken the view that "properly using the highway" means remaining on the highway and have declined to impose liability on a utility when a vehicle leaves the road and strikes a pole that does not otherwise obstruct traffic in the traveled portion of the road, sometimes grounding their decision on a lack of duty to anticipate such a departure, sometimes on a holding that the location of the pole was not the proximate cause of the plaintiff's injury. *See,* for example,

*Armand v. Louisiana Power & Light Co.,* 482 So.2d 802 (La.App.), *cert. denied,* 484 So.2d 669 (La.1986), involving an intoxicated driver whose car went unexpectedly into a spin on a wet road, jumped a curb, and struck a pole less than three feet from the curb. In a split decision, the court held that the location of the pole did not create an unreasonable risk of harm and that to conclude otherwise, in light of the many poles and trees lining the streets, would be tantamount to imposing strict liability. A utility company, the court said, "has no obligation to guard against rare exigencies such as an out of control vehicle leaving a traveled roadway." Apart from that lack of duty, the court concluded as well that the pole's location "was not a cause-in-fact of the accident, nor was it a substantial contributing factor." *Id.* at 804.

A similar result was reached in *Oram v. New Jersey Bell Telephone Company,* 132 N.J.Super. 491, 334 A.2d 343 (N.J.Super.A.D.1975). The plaintiffs were passengers in a car that was forced off the road in such manner that the left side of the car struck a pole located approximately two feet from the traveled portion of the road. Affirming a summary judgment entered for the utility, the court first noted that, because it was the left side of the car that struck the pole, the likelihood was that the collision would have occurred even if the pole were farther away. *See* 4 BLASHFIELD AUTOMOBILE LAW § 163.21 (3d ed.1965). Apart from that, echoing the view of the *Armand* court, the New Jersey court concluded that a utility "is under no obligation of guarding against extraordinary exigencies created when a vehicle leaves the traveled portion of a roadway out of control." *Id.* at 345. To require a utility to anticipate such an extraordinary circumstance, it added, "would be to require it to exercise extraordinary rather than ordinary care to prevent injuries." *See also Clinkenbeard v. City of St. Joseph,* 321 Mo. 71, 10 S.W.2d 54 (1928).

The RESTATEMENT takes a *somewhat* more liberal approach, by recognizing the prospect of liability in certain settings for off-road collisions. RESTATEMENT (SECOND) OF TORTS, § 368 provides:

"A possessor of land who creates or permits to remain thereon an excavation or other artificial condition so near an existing highway that he realizes or should realize that it involves an unreasonable risk to others accidentally brought into contact with such condition while traveling with reasonable care upon the highway, is subject to liability for physical harm thereby caused to persons who (a) are traveling on the highway, or (b) *foreseeably* deviate from it in the ordinary course of travel."

(Emphasis added.)

Clause (a) in the RESTATEMENT section represents the *Earp* situation. Clause (b) provides some area of possible expansion, although, in practice, it has not served as the basis for a major shift in thinking. The focus remains on foreseeability. Comment h to § 368 declares that "the essential question is whether [the pole] is so placed that travelers may be expected to come in contact with it in the course of a deviation reasonably to be anticipated in the ordinary course of travel." Though noting the obvious relevance of the distance between the condition and the roadway, the comment points out that distance is important "only as it affects the recognizable risk" and that other factors, such as the nature of the condition itself, its accessibility, and the extent and character of the use of the highway, must be taken into account. Comment e says essentially the same thing, that "[t]he public right to use the highway carries with it the right to protection by reasonable care against harm suffered in the course of deviations which may be regarded as the normal incidents of travel."

The split in the decisions reflects differing views of what a utility should reasonably anticipate and over the countervailing consequences and benefits of extending a utility's liability. Some courts continue to adhere to the view that a utility cannot reasonably be expected to anticipate and protect against out-of-control vehicles leaving the traveled part of the road, although, increasingly, they are looking at a variety of factors in reaching that conclusion and not drawing it solely from the fact that the accident occurred off the roadway. *See,* for example, *Rothwell v. West Cent. Elec. Co-op., Inc.,* 845

S.W.2d 42 (Mo.App.1992), where, as here, the driver lost control of the vehicle, crossed the center line and oncoming lane, and struck a pole some eight to eleven feet off the other side of the road. The court denied liability, noting, at 44:

"In general, this type of accident involving the pole is not reasonably foreseeable. This court finds nothing to show that the pole was located so close to the roadway that it would have been a dangerous obstruction to anyone properly using the roadway. There was no evidence of a vehicle ever colliding with a pole in this location in the three decades of this line."

It would be unreasonable, the court added, to find that the utility owed a duty "to a motorist who unforeseeably deviated from the roadway and hit a pole at least eight feet from the road." *Id.* That court thus looked at the extraordinary nature of the deviation, the distance between the pole and the road, and the lack of earlier collisions.

*Boylan v. Martindale,* 103 Ill.App.3d 335, 59 Ill.Dec. 43, 431 N.E.2d 62 (1982) and *Gouge v. Central Illinois Public Service,* 144 Ill.2d 535, 163 Ill.Dec. 842, 582 N.E.2d 108 (1991) are additional examples of this approach. In *Boylan,* the plaintiff's car was struck in an intersection collision and knocked into a pole located six to twelve inches from the traveled portion of the roadway. Finding no liability on the part of the utility, the court concluded that the mere placement of the pole at that distance "does not, in and of itself, create an unreasonable risk to others traveling with reasonable care" and that it could not determine from the pleading "what, if any particular dangerous roadway condition may have caused automobiles to leave the roadway and collide with the utility poles." *Id.* at 70. In *Gouge,* the driver lost control of the car while rounding a curve, left the road, and struck a pole 15 feet from the paved surface. Holding that the action by him and his passenger was properly dismissed, the court determined that the utility "does not owe a duty to motorists who unforeseeably deviate from the traveled portion of the roadway and strike a utility pole located 15 feet from the roadway." *Id.* at 114.

Indiana has rendered decisions going both ways. In *Bush v. Northern Indiana Public Service,* 685 N.E.2d 174 (Ind.App. 1997), the driver, speeding around a curve, lost control of the car and collided with a pole four-and-a-half feet from the road. The court affirmed a summary judgment in favor of the utility in an action brought by a passenger in the car on three grounds: (1) the utility had no relationship with the passenger sufficient to support a duty; (2) the harm was not foreseeable; and (3) it was the driver's negligence, rather than the placement of the pole, that was the proximate cause of the accident and the plaintiff's injuries. With respect to foreseeability, the court acknowledged that it might be foreseeable that a motorist would leave the road and collide with a pole if the pole is located on a sharp curve or on an island in the middle of a dangerous intersection, or where there had been "several prior accidents involving the same pole," but concluded that "when there is nothing inherent in the location of the pole to put the utility on notice that an accident might occur, it cannot be said that the harm was foreseeable." *Id.* at 178. A utility, it added, is only required to anticipate the ordinary and normal use of the highway, not "the illegal and reckless conduct of motorists." *Id. Compare,* however, *Northern Indiana Public Serv. Co. v. Sell,* 597 N.E.2d 329 (Ind.App. 1992), also affirming summary judgment for the utility when the driver fell asleep, crossed the center line, and went down an embankment, with *State v. Cornelius,* 637 N.E.2d 195 (Ind.App.1994) and *Goldsberry v. Grubbs,* 672 N.E.2d 475 (Ind.App.1996), reversing such summary judgments.

Florida has taken an approach similar to that in *Bush.* In *Padgett v. West Florida Elec. Coop., Inc.,* 417 So.2d 764 (Fla.App.1982) and *Florida Power & Light v. Macias By Macias,* 507 So.2d 1113 (Fla.App.1987), it has adopted the general rule that "the chance that a vehicle in the ordinary course of travel will deviate from the roadway and collide with a pole is only a remote possibility, under certain circumstances it is not a legally foreseeable event." *Florida Power & Light,* 507 So.2d at 1115. To recover, therefore, a plaintiff "must present some evidence which indicates a particularly danger-

ous condition which would make it likely, and thus foreseeable, that vehicles would deviate from the roadway and collide with the particular pole alleged to have been negligently maintained." *Id.* at 1116.

New York has taken somewhat of a dual position. In *Hayes v. Malkan,* 26 N.Y.2d 295, 310 N.Y.S.2d 281, 258 N.E.2d 695 (1970), the court cited *Trabisco v. City of New York,* 280 N.Y. 776, 21 N.E.2d 615 (1939), for the proposition that, if an obstruction is in close proximity to the pavement *and within the highway right of way,* a question of fact is raised as to whether the placement of the object was such as to create an unreasonable danger for travelers on the highway, along with the exception enunciated in *Darling v. State of New York,* 16 N.Y.2d 907, 212 N.E.2d 152, 264 N.Y.S.2d 698 (N.Y.1965), that that rule did not apply when the evidence clearly indicated that the negligence of the driver was the proximate cause of the accident. The court, then, in a four-to-three decision, confirmed that exception and determined that the *Trabisco* rule also did not apply when the obstruction is located on private property, not within the public right of way. A contrary ruling, it said, would severely restrict the adjoining property owner's use of his or her own land, for, if carried to its logical conclusion, it "would require a landowner to remove every tree, fence, mailbox or name sign located on his property in the vicinity of the highway, or permit them to remain, subject to possible liability." *Id.* at 696. This, the court said, "would impose an intolerable burden upon a property owner." The *Hayes* court reversed a judgment for the passenger in a car that collided with a utility pole located seven inches from the side of the road.

In *Contey v. New Jersey Bell Telephone Co.,* 136 N.J. 582, 643 A.2d 1005 (1994), the court recounted the fact that 65,000 injuries and 1,500 deaths occur annually from vehicle/pole collisions and some of the efforts made by the Federal Highway Administration to reduce or mitigate such collisions. Noting that, under New Jersey law, utilities did not have the unilateral right to determine the location of poles along the public roadways, the court concluded that the problem was

best resolved by the governmental authorities responsible for designing, constructing, and maintaining roads and highways, rather than by placing tort liability on the utility companies:

> "We believe that responsibility for the safety of motorists should rest with those who own, control, and maintain the thoroughfare. Although utility companies have a duty to foresee that motorists will leave the traveled portion of the highway, the governmental bodies and highway planners are best suited to determine how the utilities should fulfill that duty. Those public bodies are in the best position to provide and to enforce standards and regulations governing utilities."

*Id.* at 1009–10.

On that basis, the court affirmed a summary judgment for the utility, notwithstanding the court's view, from the accident scene itself, that the likelihood of a motorist striking the particular pole was great, that it had been struck before, and that precautions taken after the accident should have been taken earlier.

Several courts have been more lenient in allowing recovery, at least under some circumstances. In *Scheel v. Tremblay*, 226 Pa.Super. 45, 312 A.2d 45 (1973), the driver, rounding a curve on a narrow road, moved slightly to the right to avoid an approaching car and struck a pole located ten inches from the paved portion of the road. Reversing the grant of summary judgment in the passenger's suit against the utility company, the court made clear that a utility's liability is not limited to cases where the pole is in the roadway itself, but may be imposed when the pole is so close to the edge of the road as to constitute a "foreseeable and unreasonable risk of harm to users of the highway," and that, in such cases, the conditions of the highway are critical. *Id.* at 47. The realities of automobile travel, it concluded, are not such that "a slight deviation from the paved portion of a road should be deemed such an extraordinary event" as to preclude liability as a matter of law.

*Scheel* is not an extraordinary case. A number of courts have found liability, or the prospect of liability, when the pole is within a few feet of the paved roadway *and* the condition and topography of the road make a deviation foreseeable. *See,* for example, *McMillan v. State Highway Com'n,* 426 Mich. 46, 393 N.W.2d 332 (1986); *Mississippi Power & Light Co. v. Lumpkin,* 725 So.2d 721 (Miss.1998); *Jacque v. Public Service Co. of Colorado,* 890 P.2d 138 (Colo.1994); *George v. City of Los Angeles,* 11 Cal.2d 303, 79 P.2d 723 (1938); *Peninsular Tel. Co. v. Marks,* 144 Fla. 652, 198 So. 330 (1940). Other courts have gone even further and found liability based ostensibly on proximity alone. *See,* for example, *Weiss v. Holman,* 58 Wis.2d 608, 207 N.W.2d 660 (1973) and earlier Wisconsin cases cited therein, concluding that persons who deviate from the traveled portion of the roadway may recover and that, when the defendant is a utility, the distance of the plaintiff's deviation from the highway, rather than foreseeability, is the important factor.

### *Conclusion*

Although some of the cases take somewhat doctrinaire positions, either as to foreseeability, proximate cause, or, as in New York and New Jersey, on strict public policy grounds, most of the courts, in their recent decisions, have adopted a more flexible approach. We think that the general principles defining the nature and scope of "duty" for tort law purposes reflect that flexibility and provide the proper guideposts.

With respect to foreseeability, it is ludicrous, in light of the documented number of collisions between vehicles and roadside poles, to suggest that off-road collisions are not *generally* foreseeable. They occur throughout the State and throughout the country every day, and, if there truly are 65,000 such collisions each year in the United States, they occur at the rate of about one every eight minutes. Vehicles can leave the roadway for a variety of reasons, of course. The vehicle may malfunction—a tire can blow, the steering or brakes can fail, causing the driver to lose control of the vehicle; the driver may swerve to avoid another vehicle or an unexpected ob-

struction on the road or, as occurred in some of the cases, actually carom off the road by the force of collision with another vehicle; the driver's ability to control the car may be suddenly impaired because of illness, trauma, or obscuring of vision; or the driver may be speeding or, through careless-ness, diversion, drowsiness, or intoxication, simply not be paying proper attention to what is ahead. These may all be "normal incidents of travel," even if they do not all constitute a proper use of the highway or traveling "with reasonable care."

The fact that these kinds of deviations occur with some frequency and are therefore generally to be anticipated does not mean that a collision with any particular pole is foresee-able, and, in judging liability, that is the requisite consider-ation. Liability must be based on the negligent placement or maintenance of the pole that was struck, not in the placement or maintenance of other poles that were not struck. Most poles, we expect, exist for years, or even decades, without incident. Most roads, we expect, are relatively safe, and most people are able to navigate them throughout their driving careers without running into a pole.

We conclude from this that, while off-road collisions may be generally foreseeable, a collision with any particular pole is not legally foreseeable merely by virtue of its proximity to the traveled portion of a road. Such a collision *may* be foreseeable, however, based on the condition and topography of the road, the proximity of the pole to the traveled portion of the road, other site conditions, and experience. Absent signif-icant changes to the road or the site, experience may be the best guide, for it tends to amalgamate many of the other factors. If a pole has existed at a relatively unchanged site for any significant length of time without serious problem, there may be little reason to anticipate a future collision, for it suggests that motorists are able to navigate that part of the road without incident.

As we pointed out, foreseeability is not the only test in determining the existence of a duty. There is also the mix of public policy considerations—among which are convenience of

administration, the extent of the burden on the utility and its capacity to bear that burden, the benefit or detriment to the community, the desire to prevent future injuries, and any moral blame associated with the placement of the pole. In that regard, we must remain cognizant of the point made by the New York court in *Hayes v. Malkan, supra,* 26 N.Y.2d 295, 310 N.Y.S.2d 281, 258 N.E.2d 695, that the same general principles that apply to utility poles may also apply to the infinite variety of other roadside conditions, including signs, railings, and the host of potential obstructions planted, erected, or simply allowed to remain by adjacent landowners— mailboxes, fences, trees, bushes, walls, landscaping devices and ornaments, and the like. The RESTATEMENT (SECOND) OF TORTS, § 368, makes that clear.

We do not wish, or intend, to establish a law that provides an absolute immunity for utility companies and gives them no incentive to use due care in the placement of their poles. Nor, however, are we willing to create the prospect of a damage award against a utility every time someone runs off the road and strikes a pole. We are not competent to decide, as a matter of common law, how far a pole must be removed from the traveled portion of a road in order to be safe; that is the function of highway and safety engineers. To make liability in every accident a jury question would, we expect (1) quickly remove the availability of affordable liability insurance for utilities, and (2) effectively force them to move hundreds, if not thousands, of poles, at enormous cost and inconvenience to them and to their customers and, even then, without absolute assurance of safety.

From our existing case law and from the principles that seem to be generally well-accepted elsewhere, we conclude as follows:

■ (1) A utility clearly has a duty not to endanger or "incommode" persons and vehicles traveling on the portion of the roadway set aside for lawful travel. *Earp* remains a valid statement of Maryland law.

(2) If the placement of the pole was either directed or expressly or tacitly approved by the governmental body responsible for the construction or maintenance of the road, the utility has, at least presumptively, complied with any duty it has to persons on the road arising from that placement of the pole. A utility is ordinarily entitled to rely on the expertise and superior interest of that authority on matters of highway safety. There may be some extraordinary circumstance in which the placement of a pole in a particular location was so obviously dangerous as to create a duty on the part of the utility not to put or keep the pole in that location or to use reasonable and lawful means to resist being forced to put it in that location, but the plaintiff will have to prove that extraordinary circumstance.

(3) In placing or maintaining a pole near a public roadway, a utility may ordinarily anticipate that travelers will use the road in a lawful and reasonable manner. If the utility has a choice as to placement, however, it must take account of any particular road or site conditions, such as sharp curves, narrowness of the road, lack of a shoulder, or potentially dangerous intersection, that may make a deviation more likely and therefore foreseeable, and not place or maintain the pole so as to create an unreasonable risk of harm to travelers.

(4) Utilities are under no tort duty to make any massive engineering inspection of all of their poles now existing along the streets and roads of the State. They may reasonably assume that poles that have remained standing for any significant length of time without serious incident do not "incommode" or unreasonably imperil traffic on the road. If made aware, however, that particular poles have been involved either in frequent accidents or any accident that is not freakish and that reasonably indicates a likelihood of future collisions, a question of fact is created whether the pole "incommodes" or unreasonably imperils traffic on the road. We do not believe, as the concurring judges apparently do, that this limited exposure will create an unfair or unmanageable burden on utilities or adjacent landowners.

Application of these principles requires that the summary judgment in this case be affirmed. SMECO had no duty to anticipate that a vehicle traveling in a posted 35 mile per hour zone would go so out of control as to spin across the oncoming lane and strike a pole that was at least 14 feet from the edge of the lane in which the vehicle was traveling. Thompson had traveled that road without incident frequently, over many years. The expert testimony produced by appellant was to the effect that (1) from Thompson's perspective, the pole was placed where it should have been placed, on the inside of the curve, and (2) the "critical speed" for that portion of the road was 52 to 56 miles per hour—that vehicles traveling at less than that speed should not leave the roadway. With respect to the question of duty, it is not a matter of whether Thompson was negligent, or whether his negligence could be imputed to his passengers; it is simply a matter that SMECO had no duty to anticipate and guard against such a deviation. Nor do we find important the fact that the particular pole was struck once ten years earlier. The record contains no information as to the nature of that collision— whether it was a freakish event not likely to be repeated.

JUDGMENT AFFIRMED; APPELLANT TO PAY THE COSTS.

Concurring Opinion by CATHELL, J. joined by ELDRIDGE, J.

CATHELL, Judge, concurring:

I concur in the result reached in this case. I write separately because I believe that the majority has not gone far enough in limiting the type of action filed in this case. The majority's reliance on foreseeability as the standard for determining liability on the part of an owner of property, whether publicly or privately owned, presumes that there could be a duty on the part of a property owner to insure that, if someone runs off the traveled portion of a public road onto the owner's property, there will be nothing on the owner's property for the vehicle to run into.

The owner of any property abutting a public road, especially abutting on curved sections, can foresee, generally, that there is a likelihood that vehicles will run off those sections of the road. When the owner is aware that cars have run off particular sections of the road onto the owner's property with some frequency, there is a more specific foreseeability that it will happen again. The majority's opinion today leaves room for an assertion by the motorist, and especially any passengers, involved in a subsequent accident, that the owner has a duty to make sure there are no obstacles on the owner's property for the uninvited motorist to strike. Leaving the door open, even if barely so, in my view, could lead to ludicrous results in future cases.

There are certainly hundreds, if not thousands, or even more, of miles of curvy rural roads in the state. Farms abut many, if not most, of these roads. If a farmer owns land devoted to a crop of timber, that abuts a road at a point where frequent accidents have occurred, then it can be argued under the majority's opinion that future accidents are foreseeable, and thus the farmer must cut down his or her trees in order to provide an unobstructed location for an accident to occur on his property. If a farmer devotes that same roadside property to pasturage and a car runs off the road, hitting the farmer's prize bull or prize boar hog causing injury to the motorist's passengers (as well as to the hog), the farmer may be liable because he or she has permitted the animals to be on the property eating his grass while cars are traveling the road. If the farmer maintains a farm pond at that same location, and a motorist runs off the road into the pond, and the motorist, or the passenger, drowns, it may be argued under the majority's opinion that the farmer can be held liable.

In hilly or mountainous areas of the state, there are curved and hilly roads that run through towns. I would imagine that accidents occur in these areas, probably in certain areas with some frequency. Businesses and residences often abut these roads, even the curved and downgrade sections. It certainly can be foreseen that trucks, or other vehicles, sometimes encounter brake problems that interfere with their ability to

remain on the road. Do the owners of improved properties at dangerous locations have a duty to move or demolish their structures in order to provide runoffs for out-of-control vehicles?

I would hold simply that there is no duty on the part of a property owner to provide a safe place on his or her property for motorists, and their passengers, to have accidents. This Court said ninety-six years ago, in *West Virginia Central & Pittsburgh R.R. v. State ex rel. Fuller,* 96 Md. 652, 666, 54 A. 669, 671–72 (1903):

> [T]here can be no negligence where there is no duty that is due; for negligence is the breach of some duty that one person owes to another. It is consequently relative and can have no existence apart from some duty expressly or impliedly imposed. In every instance before negligence can be predicated of a given act, back of the act must be sought and found a duty to the individual complaining, the observance of which duty would have averted or avoided the injury..... As the duty owed varies with circumstances and with the relation to each other of the individuals concerned, so the alleged negligence varies, and the act complained of never amounts to negligence in law or in fact; if there has been no breach of duty.

The case of *Lamb v. Hopkins,* 303 Md. 236, 492 A.2d 1297 (1985), involved the duty of a person, who had control over a person he knew to be dangerous, to exercise due care so that the dangerousness of the actor did not result in injury to another. While it did not discuss the duties of property owners to provide safe havens for accident-prone motorists, the opinion did discuss certain principles applicable in the case *sub judice.* Judge Cole, for the Court, stated:

> Three basic elements are necessary to state a cause of action in negligence. First, the defendant must be under a duty to protect the plaintiff from injury. Second, the defendant must fail to discharge that duty. Third, the plaintiff must suffer actual loss or injury proximately resulting from that failure. *See, e.g., Scott v. Watson,* 278 Md.

160, 165, 359 A.2d 548, 552 (1976); *Peroti v. Williams*, 258 Md. 663, 669, 267 A.2d 114, 118 (1970). The focus in this case shall be on the first element, duty, which in general terms requires an actor to conform to a certain standard of conduct for the protection of others against unreasonable risks. *See Prosser and Keeton on the Law of Torts* § 30, at 164 (W. Keeton 5th ed.1984)....

Appellants basically contend that an individual who controls a person known by him to be dangerous owes a duty to exercise due care to those who may be foreseeably harmed by the failure to exercise this level of care, regardless of whether the foreseeably harmed person is readily identifi-.able.... The appellees, however, counter that they owed no duty of care to the Lambs because the appellees had neither the right nor the ability to control Newcomer's conduct. Absent a special relationship not present here, appellees contend that no basis exists for imposing liability on them for Newcomer's tortious acts.

In support of their respective positions each party relies upon §§ 315 and 319 of the *Restatement (Second) of Torts* (1965) [hereinafter cited as Restatement]. Because we have never examined these provisions in detail in the past, *cf. Scott v. Watson, supra* (citing § 315), we find it necessary to do so now.

### A.

Section 315 is a special application of the general rule set forth in § 314. Section 314 states that "[t ]he fact that the actor realizes or should realize that action on his part is necessary for another's aid or protection does not of itself impose upon him a duty to take such action." *Id.* at 241–42, 492 A.2d at 1300 (emphasis added) (alterations in original).

*Lamb* clearly involves another area of negligence law. Nonetheless, I fail to see any duty owed by a property owner to people who crash onto and into his or her property, nor do I see any special relationship between property owners and

crashing motorists. Merely because a property owner may realize that he or she has the power to make the property safer for people who crash into or onto it, "does not of itself impose upon him a duty to take such action." *Lamb*, 303 Md. at 242, 492 A.2d at 1300; Restatement, *supra* § 314.

In my view, without duty there is no liability, regardless of whether a result is foreseeable or a party has the power to influence that result. I respectfully suggest that the majority's emphasis in this case on foreseeability principles is unnecessary and, perhaps, with all due respect, misleading, in that such emphasis may suggest, even in similar circumstances, that property owners have a duty to utilize their property in such a manner that uninvited, crashing motorists are protected from injuring themselves. Property owners are not insurers of the safety of motorists who crash upon their property. So long as a property owner does not permit his activities to encroach onto the traveled portions of highways, i.e., the area designed for lawful use of motorists, the Court should hold that owners have no duty to do anything on their property to lessen the damage to passengers injured by the actions and/or negligence of themselves or others.

Judge ELDRIDGE has authorized me to state that he joins in this concurrence.