979 A.2d 167

**BOARD OF COUNTY COMMISSIONERS
OF CECIL COUNTY, Maryland**

v.

**Karl W. DORMAN.**

**No. 0757, Sept.Term 2007.**

Court of Special Appeals of Maryland.

Aug. 28, 2009.

Victoria M. Shearer (Kevin Karpinski, Karpinski, Colaresi & Karp on the brief), Baltimore, for appellant.

Charles L. Scott, Jr., (Scott & Scott on the brief), Elkton, for appellee.

Panel: SALMON, WOODWARD and GRAEFF, JJ.

SALMON, J.

This case concerns a very serious motorcycle accident that occurred on a narrow country road located in Cecil County, Maryland, about one-tenth of a mile west of the intersection of Nottingham Road and Pulaski Highway (Rt.40). In the vicinity of the accident scene, Nottingham Road is straight and flat. The west bound lane of Nottingham Road is nine-feet, seven-inches wide and the east bound lane is eight-feet, seven-inches wide. Nottingham Road has grassy strips on both sides of the roadway. A line of utility poles, all set close to the roadway, are in the grassy strips on both sides. In addition, a short distance down the road from the place where the accident occurred, on the right side of the roadway for westbound motorists, trees and bushes border the strip.

On the afternoon of June 3, 2002, Staff Sergeant Karl W. Dorman, a member of the Maryland National Guard, was off duty and riding his motorcycle. He left Pulaski Hwy. and turned (west bound) onto Nottingham Road. The Sergeant was familiar with the roadway because he had lived in the area most of his life. Sergeant Dorman slowed his motorcycle to 30 miles per hour and saw a Toyota pickup proceeding in the opposite direction (east bound) on Nottingham Road. The pickup had its left turn signal on and was driven by Bernice P. Hollifield. Ms. Hollifield then abruptly turned her pickup directly into the path of Sergeant Dorman's motorcycle. She made the left turn in an attempt to enter the driveway to Steeles Motel, which was located to Sergeant Dorman's immediate right.

Ms. Hollifield's left turn maneuver caused her vehicle to strike the left side of the motorcycle, which re-directed the cycle and its passenger to the right and into a utility pole located in the grassy strip. As a result of the collision with the pole, a portion of Sergeant Dorman's right leg was amputated.

On August 2, 2002, about two-months post-accident, Sergeant Dorman hired an attorney to represent him. An investigation revealed that the utility pole that Sergeant Dorman's

motorcycle struck was 27–29 inches [1] from the paved (westbound) portion of Nottingham Road.

In April 2003, about ten months post-accident, Sergeant Dorman's attorney retained Fred Hanson, a highway safety engineer, to provide an opinion as to the potential liability of certain utility companies for locating and maintaining the utility pole in close proximity to the roadway. The safety engineer suggested to plaintiff's counsel, shortly after he was hired, that the utility companies might have been required to obtain permits to locate the poles along Nottingham Road and suggested that counsel contact various state and county highway departments for further information.

On April 21, 2003, an agent of plaintiff's counsel sent out freedom of information requests to various state and county agencies to determine, *inter alia*, whether Nottingham Road was a state or county road and also to ascertain the width of the right-of-way adjacent to the road and whether any permitting procedures were in effect concerning the location of the utility poles. On May 21, 2003, even though counsel did not know at that point whether the pole was located in Cecil County's right-of-way,[2] Sergeant Dorman's attorney sent Cecil County a notice of a possible future claim against it for the subject accident.

Sergeant Dorman, on May 10, 2005, filed a complaint in the Circuit Court for Cecil County, in which he sought damages for injuries suffered in the June 3, 2002 accident. He named as defendants, among others, the Board of County Commissioners for Cecil County (hereafter "the County") and Bernice Hollifield. Contemporaneously with the filing of his complaint, Sergeant Dorman filed a motion to waive the require-

---

1. An accident reconstruction expert hired by Sergeant Dorman testified that the nearest point of the utility pole to the paved portion of westbound Nottingham Road was 29 inches. Another expert hired by Sergeant Dorman, however, testified that the utility pole was 27 inches from the paved portion of the roadway.

2. Counsel for Sergeant Dorman learned on August 23, 2003, that Nottingham Road was maintained by the County.

ment set forth in Maryland Code (1974), section 5–304, of the Courts and Judicial Proceedings Article ("C.J."), that a person intending to sue a local government for unliquidated damages must give that local government notice of intent to sue within 180 days of the accident. The grounds for the motion was that "prior to his engagement of a highway safety engineer in April 2003, ten (10) months after the accident, [p]laintiff had no inkling that Cecil County might bear responsibility for the location of the subject utility pole."

Sergeant Dorman filed an amended complaint on May 17, 2005, in which he named as defendants, among others, Verizon Maryland, Inc. ("Verizon") and Delmarva Power and Light Company. The complaint alleged that Verizon owned the utility pole that was struck by Sergeant Dorman and that Delmarva Power and Light "owned, leased, or used" that pole. According to the amended complaint, the utility companies breached their duty to the plaintiff because they, or their corporate predecessors, 1) "were responsible for locating and/or installing and/or maintaining" in its present location "the . . . utility pole [that the plaintiff struck]" and 2) they breached their duty to plaintiff "not to locate, install or continue to locate and maintain its/their utility pole in such close proximity to the paved portion of Nottingham Road."

The County filed a motion to dismiss the complaint due to the plaintiff's failure to provide it with written notice of intent to sue within 180 days of the subject accident as required by Cts. & Jud. Proc, Section 5–304. A hearing was held concerning the competing motions relating to the notice statute. At the conclusion of the hearing, the court ruled that Sergeant Dorman had shown "good cause" for failing to give the County notice of intent to sue within 180 days of the accident. The motions judge also found that the County had failed to show any prejudice occasioned by the late notice. A written order denying the County's motion was entered on August 10, 2005.

Verizon and Delaware Power and Light each filed motions for summary judgment, which Sergeant Dorman opposed. A hearing on the motions was held on June 4, 2007. The

motions judge ruled in favor of the utility companies and in doing so relied on *Coates v. Southern Maryland Electric Coop.*, 354 Md. 499, 731 A.2d 931 (1999).[3] In granting summary judgment in favor of the utility companies, the judge said, in relevant part:

As the [*Coates*] Court held in its holding number 4, utilities are under no tort duty to make any massive engineering inspection of all of their poles now existing along streets and roads of the state. They may reasonably assume that the poles that have remained standing for any significant length of time without serious incident, do not incommode or unreasonably imperil traffic on the road.

\* \* \*

The *Coates* case[ ] further stated, absent significant changes to the road or the site, experience may be the best guide for attempts to amalgamate any of the other factors. If a pole has existed at a relatively unchanged site for any significant length of time without serious problem, there may be little reason to anticipate a future collision, for it suggests that motorists are able to navigate that part of the road without incident. And what I am getting to, of course, is the duty on the owners of the pole to motorists and specifically in this case to the Plaintiff. In the instant action, there is not evidence to dispute that the pole has remained in its current location for at least 40 years without any incident reported to or by the police, Delmarva, Verizon or the nearest landowner.

\* \* \*

Moreover, assuming that Delmarva and/or Verizon even own the pole, they were entitled to reasonably assume that a pole that had remained standing for over 40 years without serious incident does not incommode or unreasonably imperil traffic on the road. There is no issue of fact as to whether the pole incommodes or unreasonably imperils

---

3. The judge who granted summary judgment in favor of the utility company was not the trial judge.

traffic on the road because it does not. Therefore, Delmarva or Verizon and perhaps the County Commissioners owed no duty to the Plaintiff and Summary Judgement as Delmarva and Verizon is hereby granted and I will sign an order to that effect.

Sergeant Dorman, on June 27, 2007, entered into a settlement with Ms. Hollifield's insurer in which her insurer paid the plaintiff $750,000.00. As part of the settlement, the parties executed a joint tortfeasor's release.[1] This left the County as the sole remaining defendant.

Trial commenced on August 20, 2007, and ended eight days later. The County moved for judgment in its favor as to liability at the end of the plaintiff's case and, once again, when the evidentiary phase of the case had concluded. The County's motions for judgment were denied. The jury awarded Sergeant Dorman slightly more than 3.2 million dollars in damages. The verdict was enrolled on August 30, 2007. The County filed a motion to remit the judgment to $200,000.00 pursuant to Md.Code Ann., Cts. & Jud Proc. Art., § 5–303(a) ("... the liability of a local government may not exceed $200,000.00 for an individual claim ..." if the suit is for unliquidated damages).

The Circuit Court, without a hearing, granted the County's motion and remitted the judgment to $200,000.00. The County then filed a motion for satisfaction of judgment based upon the words of the release signed by Sergeant Dorman and Ms. Hollifield and the Uniform Contribution Among Tortfeasors Act. The County asserted that an application of a credit in the amount of Ms. Hollifield's pro rata share (50% of $3.2 million

---

**4.** The Release contained the following provision, among others:
   ... The Plaintiff hereby agrees that all damages recoverable by him against anyone other than Hollifield are hereby reduced under the provision of the Uniform Contribution Among Tortfeasors Act *to the extent of the statutory pro rata share of Hollifield,* and agrees that Hollifield is to be considered a joint tortfeasor with any other tortfeasors liable to the plaintiff for damages arising out of the 'Accident' to the same extent as if Hollifield was adjudicated to be a joint tortfeasor by a final judgment of a court of record after a trial on the merits. (Emphasis added.)

or $1.6 million) was required; and, because $1.6 million exceeded the $200,000.00 judgment against it, the judgment should be reduced to zero. Sergeant Dorman opposed the motion, arguing that the court should apply the 50% credit first, thereby reducing the judgment to $1.6 million, and next reduce that judgment to $200,000.00 as required by section 5–303(a) of the Courts and Judicial Proceedings Article. The motions judge agreed with Sergeant Dorman and a final judgment in the amount of $200,000.00 was entered.

The County filed a timely appeal in which it raises numerous issues.[5] One of those issues is whether the trial judge erred when it denied the County's motion for judgment based on the County's contention that it did not owe Sergeant Dorman a duty to remove (or require others to remove) the utility pole. We agree with the County as to that point and shall hold that the trial court erred in denying the County's motion for judgment made at the end of the evidentiary phase of the case. It is therefore unnecessary to decide the other issues raised by the County.[6]

## I.

The date that Nottingham Road was built was not shown in the record. The record does indicate, however, that Notting-

---

5. Sergeant Dorman also filed a cross-appeal in which he contested the grant of summary judgment in favor of Verizon and Delmarva Power & Light. That appeal, however, was subsequently dismissed after plaintiff and the utility companies reached a settlement.

6. Issues raised by the County include, but are not limited to, the following:
   1. Whether the trial court abused its discretion by denying the County's Motion to Dismiss based on Dorman's failure to provide timely notice under the Local Government Tort Claims Act ("LGTCA"), and by granting Dorman's motion to waive the notice requirement?
   2. Whether the trial court erred by denying Cecil County's assertion of immunity with respect to Dorman's negligence claim alleging that the County failed to enact a law regulating utility company's placement of poles?
   3. Whether the trial court erred by denying the County's motion for satisfaction of judgment based upon the Uniform Contribution Among Tortfeasors Act and the Release?

ham Road was neither designed nor built by the County. The pole that Sergeant Dorman struck was initially erected by a utility company in 1955. The pole was replaced in 1961.

The history of Nottingham Road was summarized by David Hollenbaugh, Deputy Director of Public Works for Cecil County, in a letter to Sergeant Dorman's attorney dated October 20, 2003. That letter was admitted into evidence at trial as plaintiff's exhibit 22 and reads, in relevant part, as follows:

> Prior to the 1970's, the county Road System was maintained by the State Road Commission. Since then, the County Road System has been maintained by the Cecil County Department of Public Works. Much of the County Road System consists of various roads that have historically been maintained by the State and subsequently the County as a result of historic use by citizens of the County. However, many of these roads were never formally planned or dedicated. Apparently, Nottingham Road is one of these roads. As a result, the County maintains its right of way based upon the historic width of the maintained right of ways as has been maintained over the last 20–30 years. Generally, whenever the County attempts to do any work along any such road, the county makes every effort to limit its disturbance to the historically maintained right of way.

The right-of-way adjoining Nottingham Road, in which the utility pole in question was located, was once owned by the State of Maryland. That right-of-way, or easement, is shown on a State Roads plat that was admitted into evidence. As shown on the plat, the right-of-way is quite narrow, but its exact width, at least to the eyes of the members of this Court, cannot be precisely determined.

Fred Hamscon, the highway safety engineer retained by the plaintiff, testified in regard to his understanding as to the width of the County's right-of-way, as follows:

> My understanding is that the county owns some distance, maybe—maybe only half a foot or so beyond the location of the pole, I think. I'm not sure. I don't recall the exact location of the pole within the county right-of-way.

There was no evidence that either Nottingham Road or the State's easement next to the road was ever formally deeded or otherwise assigned to Cecil County. Presumably at least, the County acquired the State's right to the easement by prescription, i.e., by using it for more than twenty years subsequent to the date in "the 1970's", when the County took over maintenance of that roadway.

Wendell Cover, Sergeant Dorman's accident reconstruction expert, who commenced his investigation of the subject accident about two and one-half years after it occurred, testified that he observed "some chunks" out of the pole-not related to the subject accident-that indicated "prior contact" with the pole. He also observed other areas of damage to the pole that were the result of the collision of Sergeant Dorman's motorcycle and leg with the pole.

Sergeant Dorman's accident reconstructionist also testified that had the subject pole been set back four feet or more from the edge of the paved portion of the roadway, Sergeant Dorman's leg would not have struck the pole and instead his body would have come to rest in a nearby grassy yard. He further opined that if Sergeant Dorman had not struck the utility pole he would not have lost a part of his leg.

There was no evidence presented that either the County or the utilities that maintain the pole, were ever notified that any motorist had ever struck the pole prior to the subject accident.

During the course of Sergeant Dorman's lawsuit, one of appellee's theories as to why the County should be held liable was that the County was responsible for the negligent construction and design of Nottingham Road. In regard to the negligent construction and/or design theory, Mr. Hamscon gave extensive testimony, in which he made the following points:

♦ The 1973 Cecil County Road Code provided for minimum lane widths of ten feet and five feet shoulders.

♦ The American Association of State Highway Transportation Officials (hereinafter AASHTO) publishes guide-

lines for highway safety and design, as well as guides for accommodating utilities on highway right-of-ways;

♦ Nottingham Road did not meet those guidelines in various ways, namely a) the 1940 AASHTO policy on highway classification specified a minimum pavement width of twenty-eight feet for single lane roadways and provided for a minimum four feet shoulder; b) the 1954 policy specified a shoulder 4–8 feet in width for low volume two lane highways; c) the 1965 AASHTO policy provided for minimum cross-section pavement widths of 26–36 feet allowing for 4 feet minimum shoulder widths; d) roads, such as Nottingham Road, were to have twenty feet minimum roadway, plus 4–6 feet useable shoulder; e) the 1965 AASHTO policy guides also provided that overhead poles should be located clear of shoulders preferably 15 feet or more from the edge of the pavement; f) the 1989 AASHTO publication recognized that motorists leave the roadway due to a variety of causes and therefore specified a "clear zone," which should be kept clear of fixed object hazards, for a distance of 7–10 feet for roads such as Nottingham Road.

Mr. Hamscon admitted at trial, however, that the policies just mentioned apply to new highway construction. There is no requirement in AASHTO that the County retrofit or redesign roadways. In his brief, filed in this Court, Sergeant Dorman concedes that the County was not under an obligation to redesign or reconstruct Nottingham Road; instead appellee maintains that the County had thirty-three years to contact the utilities and ask them to remove or relocate the pole. That theory was based on the proposition that because AASHTO publications, which dealt with the best practices for new construction, gave the County at least constructive knowledge that the placement of the utility pole in question was dangerous.[7]

---

7. In Sergeant Dorman's memorandum of law in opposition to the County's motion for judgment notwithstanding the verdict, or in the

## II.

In the case at hand, there was testimony elicited from plaintiff's expert, Mr. Hamscon, which, if credited, would have established a duty that the County owed to motorists, such as Sergeant Dorman. Mr. Hamscon testified:

[T]here is no requirement [in AASHTO that old roadways be made wider or that shoulders be widened to eliminate hazards]. AASHTO is very clear in some of its standards of care, they say this is not a mandate to initiate a building program. That is clear. What in this case clearly should have been done was to take an initiative to get that telephone pole off of the shoulder, which would have involved contacting the utility, advising the utility of the hazard, and maybe informing them forcibly if necessary this is our property, Nottingham Road is property of Cecil County as of the 70's, get your pole off of here.

But whether a duty exists is not legitimately established by calling an expert witness to the stand, no mater how qualified that expert might be. The existence, *vel non*, of a duty is a legal issue to be determined by the court after "weighing the various policy considerations and reaching a conclusion that the plaintiff's interests are, or are not, entitled to legal protection against the conduct of the defendant." *Coates, supra*, 354 Md. at 509, 731 A.2d 931, (quoting *Rosenblatt v. Exxon*, 335 Md. 58, 77, 642 A.2d 180 (1994)). In establishing whether a duty exists, courts first apply a " 'foreseeability of harm' test, which is based upon the recognition that duty must be limited to avoid liability for unreasonably remote consequences." *Id.* (quoting *Rosenblatt, supra*, 335 Md. at 77, 642 A.2d 180). Foreseeability, however, is not the

---

alternative for a new trial, counsel for Sergeant Dorman worded his theory of liability as follows: "The Plaintiff is not asserting that Nottingham Road was improperly designed or constructed, or that reconstruction of the road (i.e., widening and the addition of paved shoulders) was required. To the contrary, the gravelmen [sic] of Plaintiff's claim is that *ordinary care* for routine maintenance obligated Cecil County *to regulate the placement of fixed object hazards*, like utility poles in the shoulder of the road and in the area designated as the 'clear zone.' "

only test to be utilized in determining the existence of a duty. "There is also the mix of public policy considerations" that must be weighed before imposing a duty upon the defendant. *Coates,* 354 Md. at 523, 731 A.2d 931.

■ A local government is charged with the duty of keeping its roads in good repair and in a condition reasonably safe for travel and use by the public and may be held liable for injuries caused by a defect in the road resulting from its negligence. *County Commissioners of Carroll County v. Staubitz,* 231 Md. 309, 314, 190 A.2d 79 (1963). *See Smith v. Baltimore,* 156 Md.App. 377, 383, 846 A.2d 1121 (2004). (A local government generally owes a duty to persons lawfully using sidewalks or other public ways. The duty is to make those ways reasonably safe for passage.); *See also, Pierce v. Baltimore,* 220 Md. 286, 288, 290–92, 151 A.2d 915 (1959) (The City of Baltimore breached a duty owed to the plaintiff to remove obstacles when the plaintiff, who was walking at night where pedestrians would be expected to walk, tripped over a plate raised seven or eight inches over a drain covering and fell into a strip of land owned by Baltimore City).

■■ Under some circumstances, the local government's duty to keep its highways safe and to remedy any dangers extends to dangers on private property adjacent to the traveled way. *See, e.g., Havre de Grace v. Fletcher,* 112 Md. 562, 570, 77 A. 114 (1910). In the Fletcher case, the plaintiff was using a public street maintained by the city of Havre de Grace. *Id.* at 565, 77 A. 114. The plaintiff was injured when an eight foot high stack of beer kegs fell on her. Id. at 566, 77 A. 114. According to the plaintiff, the city of Hagerstown had permitted the owners of the kegs to stack them near the sidewalk "in such a manner as to be dangerous to persons passing along and upon said street" and failed to require the owners of the beer kegs to remove them. *Id.* at 566–67, 77 A. 114. The *Fletcher* Court held that the "duty neglected by the defendant in this case was a duty to the plaintiff in respect to the right which as a member of the public she enjoyed in the free and safe use of the public street, and the special and

peculiar damages she had suffered by the breach of the duty by the defendant," which entitled plaintiff to bring a cause of action against the city of Havre de Grace. *Id.* at 570, 77 A. 114. *Fletcher*, however, is distinguishable from the case at hand because Sergeant Dorman was not injured on the roadway and, unlike the beer kegs, the utility pole posed no hazards to motorists lawfully on Nottingham Road.

Appellee, although acknowledging that it "perhaps . . . appears at first glance" that *Coates, supra*, controls this case, argues that a "reasonable analysis" of the *Coates* opinion reveals that it does not. Besides attempting to distinguish *Coates*, appellee maintains that the duty of a local government to keep its highways safe includes a duty to exercise ordinary care to remedy or cause to be remedied those conditions off the traveled portion of the roadway that "it knows or should know create a danger" to highway use. Dorman cites three cases in support of his position, viz: *Keen v. Havre de Grace*, 93 Md. 34, 38–39, 48 A. 444 (1901) (Pedestrian fell into a hole in the sidewalk of which the city of Havre de Grace had prior knowledge); *Washington County v. Gaylor*, 140 Md. 375, 377, 117 A. 864 (1922) (Motorist lawfully driving on a highway was injured at a time when the winds were moderate; a large decaying tree limb that extended across the highway fell and injured the motorist; the condition of the limb "had existed some time before the accident" making it a jury issue as to whether the County Commissioners had knowledge of the limb's condition; and therefore plaintiff had met his burden of proving that the County had breached its duty of keeping the roadways reasonably safe); and *Magaha v. Hagerstown*, 95 Md. 62, 71–2, 51 A. 832 (1902) (City liable when a pedestrian fell on an icy city-owned street, even though the ice was caused by the fact that a saloon keeper was allowed to empty water in large quantities into the street). The common thread running through the cases just cited is that the governmental entity is charged with the duty to keep the streets and highways it maintains safe by removing materials or objects on adjoining property that interfere with or endanger travel within the confines of the road or public walkway, and, when

necessary, to repair the roads or walkways. Neither of those duties were breached in this case.

In his brief, appellee places major reliance on the case of *Phelps v. Howard County,* 117 Md. 175, 82 A. 1058 (1912), and a later appeal arising out of the same case, *Earp v. Phelps,* 120 Md. 282, 87 A. 806(1913).

The facts in the two *Earp* appeals were summarized by Judge Wilner, speaking for the *Coates* majority, as follows:

> The plaintiff, a passenger on a hay wagon driven by a team of five horses, was injured when the "lazy board" upon which he was seated collided with a telegraph pole. He sued the county—the owner of the road—and the telegraph company, alleging that the pole was located too close to the roadway, such that the collision ensued even though the wagon was entirely on the roadway, and that its placement thus violated the defendants' duty to keep the public roads in a safe condition for public travel. The first appeal arose from the granting of the defendants' demurrers, the argument being that the complaint was not sufficiently definite in describing the alleged negligence. We concluded that the complaint was sufficient, that whether the road was made unsafe by the location of the pole was an issue of fact, to be determined after considering "the dimensions, conformation and established use of the roadway." *Phelps v. Howard Co.,* 117 Md. at 179, 82 A. at 1059. We said, in that regard:
>
> > There may be conditions under which the erection and maintenance of a telegraph pole as near as the one in question to the traveled portion of a highway would not be regarded as an unreasonable interference with the rights of the public. But it could not be held, as a matter of law, that such an object could under all circumstances be so located with impunity.
>
> *Id.*
>
> On remand, trial was held, resulting in a judgment for the plaintiff. It was established that the plaintiff was sitting on the "lazy board," which extended about two-and-a-half feet beyond the hub of the left rear wheel. Immediately on the

left side of the road was the pole, and immediately on the right side was a tree. The entire roadway between those objects–221/2 feet-was paved, and the evidence showed that the road "was used all the way from the tree to the telegraph pole." *Earp v. Phelps, supra,* 120 Md. at 286, 87 A. at 808. In order to pass another wagon, the driver moved to the left, and, with the wheels of the wagon still entirely on the road, the plaintiff's legs collided with the pole. In that second appeal, we took as established that the plaintiff was brought into contact with the pole while the wagon was in the traveled part of the road and while he was riding in a proper and customary manner. The question, then, was whether the pole was "so placed in the highway as to injuriously incommode its use for the purposes of public travel or constitute 'a source of danger by reason of its close proximity to the travelled [sic] portion of the road.' " *Id.* at 288, 87 A. at 808, quoting in part from *Phelps v. Howard Co., supra.*

We answered in the affirmative. The pole, as located, "was an object against which a vehicle on the travelled [sic] way could readily strike in passing." *Id.* The road space available for travel "was considerably less than the usual legal width of 30 feet, and it can not be said to have been so wide as to make the danger of collision with the pole too remote and improbable to be reasonably anticipated by those who were responsible for its location." *Id.* at 288–89, 87 A. 806, 87 A. at 809. Accordingly, we declined to hold as a matter of law that the pole could be erected and maintained at that location without liability "for the injury it occasioned to one using the road in a lawful and customary way." *Id.* at 289, 87 A. at 809. We noted in that regard that, although the issue was essentially one of fact and in the particular case was submitted to and decided by a jury, it cannot "be made the subject of mere conjectural or capricious judgment and should not be submitted to the jury in the absence of proof legitimately tending to support the theory upon which recovery is sought." *Id. The critical fact in Earp, of course, was that the collision and injury*

*occurred while the plaintiff and the vehicle were lawfully on the traveled portion of the road; the pole thus interfered with the safe travel of a vehicle while on the traveled portion of the public roadway.*

*Coates,* 354 Md. at 510–12, 731 A.2d 931 (footnote omitted) (emphasis added).

In the case *sub judice,* the "critical fact" existing in the *Earp* appeals is not here present.[8] The collision with the pole did not occur while Sergeant Dorman was "lawfully on the traveled portion of the road." *Id.* at 512, 731 A.2d 931. He was forced off the traveled portion of the road by the negligence of another motorist.

Appellant also relies heavily on the case of *East Coast Freight Lines v. Mayor and City Council of Baltimore,* 190 Md. 256, 58 A.2d 290 (1948). That case arose out of an accident that occurred on a dark and rainy night when a tractor-trailer, proceeding eastbound on Wilkins Avenue, struck the curbing on a grass plot in the center of Wilkins Avenue, then struck a lamp post located three feet from the beginning of the plot, and next crossed into oncoming traffic and collided with another truck. *Id.* at 264–65, 58 A.2d 290. At the time of the collision, due to a storm, the lights in the vicinity were off, including the light on top of the lamp-post that was struck and, except for some road markings that were hard to see because of weather conditions, there were no warning signs, shields, or barriers notifying motorists that there was a possible obstruction. *Id.* at 264, 58 A.2d 290.

In the *East Coast Freight Lines case,* the primary question presented was whether proof that the City had established a grass plot in the center of the highway was sufficient "to present to the jury the question as to whether the City was negligent in not providing adequate warnings at the beginning of the grass plot, to the East Coast truck on this dark, rainy night when there was evidence that the marks on the road

8. The *Coates* Court said that the *Earp* cases "represent the farthest reach" of the Maryland cases in imposing liability on the owner of utility poles. 354 Md. at 512, 731 A.2d 931.

were not visible to the driver of the truck approaching it for the first time." *Id.* at 271, 58 A.2d 290. The *East Coast Freight Lines* Court answered that question in the affirmative and gave the following explanation:

Turning to the facts in the case at bar; it is apparent that while the grass plot was not a nuisance, nevertheless it was an obstruction to the free flow of traffic along Wilkens Avenue, which, under the weather conditions existing at the time of this accident, might well be dangerous to vehicles approaching this grass plot from the west. Other than the lights on the lamp posts and markings on the street, the City had provided no other device to aid travelers on the highway under the weather conditions existing at that point at the time of the accident. There was testimony that on account of the storm the lights were out and the markings on the street were not seen. It appears that the grass plot in the center of Wilkens Avenue was erected during the years 1937 and 1938 *and since that time there had been seventeen collisions at night with the lamp post located within three feet of the east end of the grass plot.* Storms such as that on the evening of July 26, 1945, are more or less common in the summertime. *It seems obvious that a green lamp post in a green grass plot surrounded by a curb, in the center of an otherwise open and unobstructed highway, is an obstruction which, under conditions which existed on the night of the accident, may have, because its color blended with the surroundings, constituted such a threat to the safety of the traveling public as to place the City under a duty to provide means of warning travelers on Wilkens Avenue of the location of the grass plot.* It appears that the City was under a legal duty to anticipate the occurrence of such weather conditions as existed at the time of the accident in this case. That such storms do occur in Baltimore City in the summer with sufficient frequency to justify a reasonable expectation that they will from time to time recur, is a matter of common knowledge. *Therefore the City should have anticipated their occurrence and have placed such warning devices, which under storm condi-*

*tions, would have permitted a traveler approaching the grass plot to have discovered its location in time to avoid colliding with it.* The City approved the plans for the construction of the grass plot and was charged with the knowledge of weather conditions common to all residents of the City. This Court is therefore of opinion that there was sufficient evidence to submit to the jury the question whether the City, in constructing this grass plot with a concrete curb in the center of the highway, was negligent in failing to place warning devices sufficient to warn east bound traffic of the presence of this center plot and therefore that the demurrer prayers should not have been granted as to the Mayor and City Council of Baltimore City.

*Id.* at 278–79, 58 A.2d 290 (emphasis added).

In regard to the *East Coast Freight Lines* case, the appellee argues:

[T]he distances of E. Coast Line are similar to the case at bar as the pole was three (3) feet from the beginning of the grass plot (versus only 27–29 inches). The City was later held liable because it was foreseeable that the obstruction authorized by the municipal authorities *would endanger persons on the highway, Id.,* 190 Md. 256, 277–278, 58 A.2d at 300.

In fact, the Court went on to state:

The municipality may be therefore liable for injuries caused by an obstruction in a public highway of which it had sufficient notice, even though the obstruction is authorized by proper municipal and legislative authorities, where it is reasonably foreseeable that it will endanger persons using the highway while in the exercise of reasonable care unless it takes the precaution of warning such persons by some reasonably adequate means.

*Id.,* 190 Md. at 277, 58 A.2d at 300.

The basis of liability is the duty incumbent upon the municipality to keep its highways safe for the public travel. The City was held liable in *E. Coast Lines* not because the grass plot surrounded by a concrete curb, with metal lamp

post unlit at night was considered unusually dangerous, but because the City was under a legal duty to anticipate the occurrence of such weather conditions (summer storms) as existed at the time of accident and should have put up warning devices to warn traffic of the presence of this plot. *Id.*, 190 Md. at 279, 58 A.2d at 301.

(Emphasis omitted.)

The *East Coast Freight Lines* case is distinguishable from the case at bar because the obstruction there at issue, a grass plot surrounded by a concrete curb with a metal lamp post within the plot, constituted a danger to motorists lawfully using the highway and therefore, there was a duty to warn the motoring public of the danger. The existence of a known danger was proven by seventeen prior accidents. The subject accident happened on a spring afternoon under good weather conditions. As already mentioned, the utility pole that was struck by Sergeant Dorman did not constitute a danger to motorists lawfully on the highway. The danger to Sergeant Dorman was caused by the driver who made a left-hand turn into his path. And, unlike the situation in the *East Coast Freight Lines* case, there plainly was no duty to warn that a utility pole was at the side of the road because its existence was obvious to anyone who looked.

This brings us to a discussion of *Coates, supra,* which involved an accident that arose when the driver of a pickup truck struck a utility pole located three feet three inches off the traveled portion of a roadway. 354 Md. at 504–526, 731 A.2d 931. The issue the *Coates* Court was required to decide was whether the circuit court erred when it granted summary judgment in favor of Southern Maryland Electric Company (SMECO) on the grounds that SMECO did not owe either the passenger in the pickup or her unborn child a duty to remove the pole. *Id.* at 507, 731 A.2d 931.

The facts in *Coates* were as follows: George Thompson was driving his employer's truck north on Oliver Shop Road accompanied by two front seat passengers, Mary Ann Coates and Lavita Coates. *Id.* at 503–04, 731 A.2d 931. Oliver Shop

Road was a rural country highway described as "hilly and twisty." *Id.* at 504, 731 A.2d 931. There was one lane in each direction and the paved highway, in total, was 21 feet 3 inches in width; the speed limit was 35 miles per hour. *Id.* At the time of the accident, the roadway was wet and the rear tires of the pickup were "kind of bald." *Id.* Mr. Thompson successfully negotiated a number of turns on Oliver Shop Road until he hit a "dip" in the roadway, which caused the pickup to slide and then to spin, counter-clockwise, from the northbound lane into the southbound lane and then into a utility pole at the side of the roadway. *Id.* As a result of the accident Mary Ann Coates was killed and Lavita Coates, who was pregnant, lost her baby. *Id.* at 503, 731 A.2d 931.

The pole that was struck by Mr. Thompson's pickup was erected in 1954. *Id.* at 504, 731 A.2d 931. In 1970, the State Highway Administration acquired ownership of the road along with a 30 foot right-of-way. *Id.* at 505, 731 A.2d 931. The pole that Mr. Thompson struck was damaged in an automobile accident approximately 10 years before the subject accident, but the nature and details of the accident were unknown. *Id.* at 505, 731 A.2d 931. After the earlier accident, "no thought was given [by SMECO] at that time to moving the pole." *Id.*

During the discovery phase of the *Coates* case, the plaintiff named two experts, Doctors John St. Clair and Paul Wright. *Id.* at 506–07, 731 A.2d 931. Dr. Wright said, in one of his depositions, that in his opinion SMECO had placed the pole "too close to the road" and that it was "accepted orthodoxy" among highway engineer designers that it was "not a very smart thing to do ... to put poles that close to the road especially in the vicinity of curves." *Id.* at 506, 731 A.2d 931. He further testified that a study of roadside crashes in Georgia demonstrated that "about 85% of fatal crashes result from striking something 30 feet or less from the edge of the pavement." In a second deposition, Dr. Wright, based on a highway design manual, "stated that it was desirable that there be a clear path on each side of the road of at least 10 feet, free of fixed objects other than guardrails." Dr. Wright opined "that a failure to comply with that standard would be a

deviation from accepted engineering practice." He confessed, however, that the design manuals he consulted "were for use by highway officials" and he did not know if those manuals "were customarily used by electric utilities in design of distribution lines." *Id.* at 507, 731 A.2d 931. Moreover, he did not know whether it was "usual and customary in electric utility practice," to locate poles in accordance with the highway design manuals to which he had referred. *Id.*

The second expert called by the plaintiffs in *Coates,* Dr. St. Clair, gave the following opinions: 1) The concrete blocks, that surrounded the pole erected by SMECO, would do substantial damage to vehicles and likely caused the injuries in the subject case; 2) although no formal policies relating to pole placement existed in the industry, the informal policy was to keep poles off the shoulders; 3) if the pole that the pickup truck had struck had been moved 6 feet rather then 3 feet off the roadway, it would have met the standards of practice in 1981 with respect to southbound vehicles traveling on the inside curve of Oliver Shop Road. *Id.* at 507, 731 A.2d 931.

In regard to the issue of foreseeability, the *Coates* Court said:

With respect to foreseeability, it is ludicrous, in light of the documented number of collisions between vehicles and road-side poles, to suggest that off-road collisions are not *generally* foreseeable. They occur throughout the State and throughout the country every day, and, if there truly are 65,000 such collisions each year in the United States, they occur at the rate of about one every eight minutes. Vehicles can leave the roadway for a variety of reasons, of course. The vehicle may malfunction-a tire can blow, the steering or brakes can fail, causing the driver to lose control of the vehicle; the driver may swerve to avoid another vehicle or an unexpected obstruction on the road or, as occurred in some of the cases, actually caroom off the road by the force of collision with another vehicle; the driver's ability to control the car may be suddenly impaired because of illness, trauma, or obscuring of vision; or the driver may be speeding or, through carelessness, diversion, drowsiness,

or intoxication, simply not be paying proper attention to what is ahead. These may all be "normal incidents of travel," even if they do not all constitute a proper use of the highway or traveling "with reasonable care."

The fact that these kinds of deviations occur with some frequency and are *therefore generally to be anticipated does not mean that a collision with any particular pole is foreseeable, and, in judging liability, that is the requisite consideration.* Liability must be based on the negligent placement or maintenance of the pole that was struck, not in the placement or maintenance of other poles that were not struck. Most poles, we expect, exist for years, or even decades, without incident. Most roads, we expect, are relatively safe, and most people are able to navigate them throughout their driving careers without running into a pole.

We conclude from this that, while off-road collisions may be generally foreseeable, *a collision with any particular pole is not legally foreseeable merely by virtue of its proximity to the traveled portion of a road. Such a collision may be foreseeable, however, based on the condition and topography of the road, the proximity of the pole to the traveled portion of the road, other site conditions, and experience.* Absent significant changes to the road or the site, experience may be the best guide, for it tends to amalgamate many of the other factors. If a pole has existed at a relatively unchanged site for any significant length of time without serious problem, there may be little reason to anticipate a future collision, for it suggests that motorists are able to navigate that part of the road without incident.

*Id.* 354 Md. at 522–23, 731 A.2d 931 (emphasis added).

Applying the aforementioned foreseeability test to the facts presented in that case, the *Coates* Court said:

[T]he summary judgment in this case [must] be affirmed. SMECO had no duty to anticipate that a vehicle traveling in a posted 35 miles per hour zone would go so out of control

as to spin across the oncoming lane and strike a pole that was at least 14 feet from the edge of the lane in which the vehicle was traveling.[9] Thompson had traveled that road without incident frequently, over many years. The expert testimony produced by appellant was to the effect that (1) from Thompson's perspective, the pole was placed where it should have been placed, on the inside of the curve, and (2) the "critical speed" for that portion of the road was 52 to 56 miles per hour—that vehicles traveling at less than that speed should not leave the roadway. With respect to the question of duty, it is not a matter of whether Thompson was negligent, or whether his negligence could be imputed to his passengers; *it is simply a matter that SMECO had no duty to anticipate and guard against such a deviation. Nor do we find important the fact that the particular pole was struck once ten years earlier. The record contains no information as to the nature of that collision—whether it was a freakish event not likely to be repeated.*

*Id.* 354 Md. at 526, 731 A.2d 931 (emphasis added).

The *Coates* foreseeability test, when applied to the facts of this case, leads us to the conclusion that Sergeant Dorman's striking of the pole in question was not *legally foreseeable.* The facts in *Coates* are quite similar to those here presented but, to the extent that the facts differ, the facts here presented give even fewer grounds to impose liability. It is true that the utility pole in *Coates* was about 10–12 inches further back from the paved portion of the roadway than the pole that Sergeant Dorman struck, but in the subject case, Nottingham Road was flat and straight and there were no dangers posed by "dips" or curves in the roadway. The posted speed limit on both roads was the same and in both cases there was no usable shoulder. The placement of the pole had remained constant in both cases for decades. And, as far as can be

9. Although the pole was only three feet, three inches off the paved roadway for a southbound motorists, the plaintiffs' vehicle in *Coates,* which was going northbound, had to cross the center line and then travel the width of the southbound lane to reach the pole.

determined, the utility pole that Sergeant Dorman struck had never been previously struck by anyone using the roadway during a period of over 40 years. Therefore, for the same reasons as expressed in *Coates,* the County had no duty to anticipate that a motorist like appellee would be endangered by the pole in question.

We must also address, as did the *Coates* Court, the public policy considerations that would come about if liability were imposed against the defendant. In that regard, the *Coates* court pointed out that a "utility clearly has a duty not to endanger or 'incommode' persons and vehicles traveling on the portion of the roadway set aside for lawful travel." *Id.* at 524, 731 A.2d 931. The *Coates* Court then went on to say:

> If the placement of the pole was either directly or expressly or tacitly approved by the governmental body responsible for the construction or maintenance of the road, the utility has, at least presumptively, complied with any duty it has to persons on the road arising from that placement of the pole.[10] A utility is ordinarily entitled to rely on the expertise and superior interest of that authority on matters of highway safety. There may be some extraordinary circumstance in which the placement of a pole in a particular location was so obviously dangerous as to create a duty on the part of the utility not to put or keep the pole in that location or to use reasonable and lawful means to resist being forced to put it in that location, but the plaintiff will have to prove that extraordinary circumstance.

*Id.* Md. at 525, 731 A.2d 931.

The *Coates* Court had no need to, and therefore did not address whether, as a matter of public policy, a duty should be imposed on State or local governments to make sure that utilities set their poles back far enough from the paved roadway so that if a vehicle travels off the roadway it will not

---

10. In his brief, Sergeant Dorman admits that no evidence was presented that the placement of the pole in the subject case was either "expressly or tacitly approved by either the County or State." In other words, the County simply acquiesced in its placement.

strike the poles. We must now address that question, and in doing so we are required to be mindful of what the *Coates* majority referred to "as a mix of public policy considerations." *Id.* at 523, 731 A.2d 931. Among such considerations are convenience of: administration, the extent of the burden on the utility and its capacity to bear that burden, the benefit or detriment to the community, the desire to prevent future injuries, and any moral blame associated with the placement of the pole.

> In that regard, we must remain cognizant of the point made by the New York Court in *Hayes v. Malkan, supra,* 26 N.Y.2d 295, 310 N.Y.S.2d 281, 258 N.E.2d 695, that the same general principles that apply to utility poles may also apply to the infinite variety of other roadside conditions, including signs, railings, and the host of potential obstructions planted, erected, or simply allowed to remain by adjacent landowners—mailboxes, fences, trees, bushes, walls, landscaping devices and ornaments, and the like. The Restatement (Second) of Torts, § 368, makes that clear.

*Coates,* 354 Md. at 524, 731 A.2d 931.

There are literally hundreds of miles of old country roads in the State of Maryland where utility poles currently exist in very close proximity to the paved part of the roadway, i.e., less than the ten foot "clear zone" espoused by appellant's expert. The same is true in regard to the streets of most cities, towns and villages in Maryland where utility lines are above ground. Moreover, if we were to impose liability against the County concerning utility poles that are in close proximity to the traveled portion of the roadway, "the same general principles that apply to utility poles [might] also apply to the infinite variety of other roadside conditions...." *Id.*

The *Coates* Court explained why it would be bad public policy to make it a jury question as to whether a utility company should be liable for the placement of the pole in every case where a motorist struck a pole and alleged that it was too close to the paved portion of the roadway. The *Coates* Court explained:

We do not wish, or intend, to establish a law that provides
an absolute immunity for utility companies and gives them
no incentive to use due care in the placement of their poles.
Nor, however, are we willing to create the prospect of a
damage award against a utility every time someone runs off
the road and strikes a pole. We are not competent to
decide, as a matter of common law, how far a pole must be
removed from the traveled portion of a road in order to be
safe; that is the function of highway and safety engineers.
To make liability in every accident a jury question would,
we expect (1) quickly remove the availability of affordable
liability insurance for utilities, and (2) effectively force them
to move hundreds, if not thousands, of poles, at enormous
cost and inconvenience to them and to their customers and,
even then, without absolute assurance of safety.

*Id.* at 524, 731 A.2d 931.

Ultimately, in determining the public policy aspect of the
question of duty, the *Coates* Court said that "utilities are
under no tort duty to make any massive engineering inspec-
tions of all their poles now existing along the streets and roads
of the State." *Id.* at 525, 731 A.2d 931. The Court continued:
"[T]hey may reasonably assume that poles that have remained
standing for any significant length of time without serious
incidence do not 'incommode' or unreasonably imperil traffic
on the road. If made aware, however, that particular poles
have been involved either in frequent accidents or any acci-
dent that is not freakish and that reasonably indicates a
likelihood of future collisions, a question is created whether
the pole 'incommodes' or unreasonably imperils traffic on the
road." *Id.*

In our view, the same public policy considerations should be
applied to local governments who, as here, simply acquiesce in
the placement of utility poles. *See* Note 10, *supra.* As
applied to this case, the County owed no legal duty to Ser-
geant Dorman because: the pole had been in place for a
significant length of time without creating any problem to
motorists and, therefore, the County had no reason to foresee
that a particular pole would incommode or otherwise imperil

traffic on Nottingham Road. On the other hand, as in the case with utility companies, a local government may be liable to persons who are injured by poles allowed to exist in close proximity to a paved roadway maintained by the governmental entity if the local government, prior to the accident, knew that the pole's proximity to the roadway posed some special dangers to motorists but took no action to remedy the danger. Any broader imposition of a duty would create too great a financial burden on local government.

For the aforegoing reasons, we hold that the trial judge erred when he denied the County's motion for judgment made at the conclusion of the evidentiary phase of the case.

**JUDGMENT REVERSED; COSTS TO BE PAID BY APPELLEE.**